*3
 
 COFFIN, Chief Judge.
 

 Factual and Procedural Background
 

 This is an appeal of one segment of a complex collection of complaints by victims of asbestos-related cancer and their survivors against producers and suppliers of asbestos products used at Bath Iron Works from the mid 1950’s until the early 1970’s. Plaintiff’s decedent, Blaine Austin, was employed at Bath Iron Works (BIW) from 1952 through the fall of 1976 as a painter and cleaner. He worked on board ships berthed in the Kennebec River at BIW, both on new ships berthed in the river after launching and on older ships brought into BIW for repair. His primary job was to follow behind the pipecoverers, who applied asbestos insulation products to the ships’ pipes, boilers and other machinery, and paint over the asbestos insulation. He was also responsible for sweeping up asbestos scraps left by the pipecoverers. During both tasks, he breathed in asbestos fibers and dust created by the pipecoverers’ cutting and shaping of the asbestos insulation. In November, 1976, plaintiff’s decedent was diagnosed as having pleural mesothelioma, an asbestos-induced cancer of the lining of the lung. He died on October 13, 1977.
 

 On June 14,1978, plaintiff brought suit in the United States District Court for the District of Maine against a number of suppliers of asbestos to Bath Iron Works. Her complaint alleged jurisdiction based on diversity of citizenship and causes of action under Maine law in negligence, strict products liability and breach of warranty. Approximately 140 other complaints by present and former employees of either Bath Iron Works or Portsmouth Naval Shipyard, or their widows, were filed in the same court near the time plaintiff filed her complaint.
 

 A number of the pretrial proceedings relating to the complaints of four of the plaintiffs, all based on injuries incurred at BIW, were consolidated. In May of 1981, five defendants moved for summary judgment against those four plaintiffs, based on the statute of limitations, lack of the privity of contract required under Maine law as a prerequisite to recovery for pre-1979 negligence or breach of warranty, and the inapplicability of Maine’s strict liability statute to claims based on products supplied before the effective date of the statute, October 3, 1973. On August 7,1981, the court granted the motions with a few minor exceptions. Plaintiff’s claims against three of the manufacturer defendants, Johns-Manville Sales Corp., Unarco Industries, Inc. (Unarco) and Raybestos-Manhattan (Raybestos), were not disposed of on summary judgment and were tried together, beginning on November 2, 1981. Plaintiff and defendant Johns-Man-ville settled during the course of the trial.
 

 At the close of plaintiff’s evidence, defendant Unarco moved for a directed verdict on plaintiff’s strict liability and breach of warranty claims. Defendant Raybestos made a similar motion at the close of all of the evidence. As to the breach of warranty claim, plaintiff indicated that she no longer intended to press the claim. She requested the strict liability count not be dismissed, but acknowledged that under Maine law, it appeared that a claim in strict liability could not be made based on products supplied before October 3, 1973. The court granted both motions, finding insufficient evidence that either defendant had supplied asbestos products to BIW subsequent to October 3, 1973 to warrant submitting the strict liability issue to the jury.
 

 At the close of all of the evidence, plaintiff moved to strike defendants’ comparative negligence defense. Defendants had introduced evidence that the decedent could have worn a respirator that would have reduced his risk of cancer, but that he had failed to do so. Plaintiff argued, in support of her motion, that there was insufficient evidence that plaintiff’s decedent was aware that exposure to asbestos could cause serious disease; thus, he could not have been negligent in failing to wear a respirator. The court denied the motion.
 

 After five weeks of trial, the jury returned a verdict in favor of defendants. The jury found that both Unarco and Raybestos were guilty of negligence that proximately caused Blaine Austin’s me-
 
 *4
 
 sothelioma and death, but that Austin was contributorily negligent and that his negligence was equal to or greater than that of the defendants. Under Maine’s comparative negligence statute, therefore, recovery was barred. Judgment was entered for the defendants on December 8, 1981.
 

 On December 11, 1981, plaintiff filed a motion for a new trial, alleging that the jury verdict was against the weight of the evidence. On December 17, 1981, plaintiff filed a motion for judgment n.o.v., alleging that there was no evidence that the decedent was contributorily negligent or, in the alternative, that the verdict was against the weight of evidence. The court denied both motions.
 

 Plaintiff appealed to this court from the judgment against her and from a number of alleged errors in the proceedings below. After the filing of that appeal, but before argument, defendant Unarco filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Reform Act, 11 U.S.C. § 101
 
 et seq.,
 
 in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division. Upon notification of that petition, on August 5,1982, this court stayed further proceedings in this appeal pending a final determination by the Bankruptcy Court. On October 1,1982, the Bankruptcy Court issued an order authorizing plaintiff to pursue her appeal in this case against parties other than Unarco. The court noted that plaintiff had not sought to have the stay lifted against defendant Unarco, but determined that the automatic stay provisions of 11 U.S.C. § 362 do not apply to the bankrupt defendant’s solvent co-defendants. Plaintiff now seeks to pursue her appeal against Raybes-tos alone. Before proceeding to the merits of this appeal, we address defendant’s contention that plaintiff should not be allowed to proceed against it alone.
 

 I. Lifting of the Stay
 

 The first issue before us is whether we should decide the merits of this appeal. On August 5, 1982, we stayed all proceedings in this case, pending a final determination by the Illinois Bankruptcy Court of the Chapter 11 bankruptcy proceeding voluntarily initiated by Unarco, one of the original co-defendants in this case. Since that time, the Bankruptcy Court has made clear its position that the automatic stay of all proceedings against bankrupt debtors provided by § 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a), applies only to the debt- or and not to the debtor’s solvent co-defendants. On the basis of that ruling, the plaintiff requested and received from the Bankruptcy Court on October 1, 1982, an order authorizing her to pursue her appeal in this court as to parties other than Unarco. On October 20, 1982, plaintiff requested this court to lift its stay of August 5, 1982 and to allow the appeal to proceed against Raybestos alone.
 

 Raybestos does not urge that the Bankruptcy Court was wrong in deciding that the automatic stay provisions of 11 U.S.C. § 362(a) apply only to the bankrupt debtor and not its solvent co-defendants. It argues, instead, that Unarco is a necessary party and that particularly because plaintiff made no effort to have the stay of proceedings against Unarco lifted, she should not be allowed to proceed against Raybestos alone.
 

 As an initial matter and because we expect that the issue will arise again in this circuit, we express our judgment that the Bankruptcy Court was correct in deciding that the automatic stay provisions of 11 U.S.C. § 362(a) apply only to the bankrupt debtor. We are persuaded by the reasoning of the Illinois Bankruptcy Court in
 
 Royal Truck and Trailer, Inc. v. Armadora Maritima Salvadorena, S.A. de C.V.,
 
 10 B.R. 488 (N.D.Ill.1981), and by a comparison of the stay provisions provided by Congress for a chapter 13 bankruptcy proceeding, which expressly include co-defendant debtors, with those provided for a chapter 11 bankruptcy proceeding, which make no mention of co-defendant debtors, that had Congress intended § 362(a) to apply to solvent co-defendants, it would have said so.
 
 See also In re: Related Asbestos Cases,
 
 23 B.R. 523 (N.D.Cal.1982);
 
 Aboussie Bros. Construc
 
 
 *5
 

 tion Co. v. United Missouri Bank of Kirkwood (In re Aboussie Bros. Construction Co.),
 
 8 B.R. 302 (E.D.Mo.1981). Courts that have come to a different conclusion do not appear to have done so on the basis that § 362 requires such a result, but rather that additional considerations warrant a stay as to all defendants.
 
 See, e.g., Federal Life Ins. Co. (Mutual) v. First Financial Group of Texas, Inc.,
 
 3 B.R. 375 (S.D.Tex.1980) (claims too interwoven to sever, although the bankruptcy court has authority to lift the stay as to less than all of the defendants);
 
 Rupp v. Cloud Nine Ltd. (In Re Cloud Nine, Ltd.),
 
 3 B.R. 202 (Bkrtcy.D.N.M.1980) (relief from stay “will result in at best only a partial resolution of the issues and at worst will further complicate the issues and result in needless relitigation”);
 
 In re White Motor Credit Corp.,
 
 11 B.R. 294, 295 (Bkrtcy.N.D.Ohio 1981) (“for many reasons (perhaps including section 362 itself), products liability plaintiffs cannot dismiss a reorganization debtor and proceed against co-defendants only”). We agree that there might be cases in which additional considerations warrant a refusal to lift the stay as to some but not all of the co-defendants; we disagree only with the assertion that those considerations should be read into § 362. It is to those additional considerations that we now turn.
 

 Defendant argues that Unarco is a necessary party to this litigation and therefore that we should not allow the appeal to proceed against Raybestos alone. It urges that we apply standards analogous to the necessary and indispensable party criteria of Fed.R.Civ.P. 19. We. agree that despite the absence of a specific rule of appellate procedure authorizing the court to delay review in the absence of necessary parties, the court has the power to make such a determination. We do not agree, however, that this is a case warranting such delay. Joint tortfeasors are not considered indispensable parties under federal law.
 
 See Field
 
 v.
 
 Volkswagenwerk AG,
 
 626 F.2d 293, 298 n. 7 (3d Cir.1980);
 
 Jett v. Phillips & Associates,
 
 439 F.2d 987 (10th Cir.1971);
 
 Herpich v. Wallace,
 
 430 F.2d 792, 817 (5th Cir.1970). The plaintiff will not be afford-ed incomplete relief. If she prevails on appeal and is entitled to a new trial on any of the issues she raises, she will be able to assert her full claim against Raybestos, leaving Raybestos to proceed against Unar-co for contribution. Whatever prejudice results to Raybestos from being forced to proceed without Unarco is simply that inherent in the principle of joint and several liability.
 

 Even absent a determination that Unarco is an indispensable party, we could stay the proceedings in the interest of judicial economy and fairness to the parties. The Supreme Court has indicated, however, that to be entitled to a stay, a party must demonstrate a clear case of hardship if there is a danger that the stay will damage the other party.
 
 Landis v. North America Co.,
 
 299 U.S. 248, 255, 57 S.Ct. 163,166, 81 L.Ed. 153 (1936);
 
 Dellinger v. Mitchell,
 
 442 F.2d 782, 786-88 (D.C.Cir.1971). In this case, the damage to the plaintiff would be the financial hardship of being forced to wait for an undefined but potentially lengthy period before receiving the money to which she may be entitled. An additional consideration is that this is only one of a number of similar cases that have been and will be brought in the federal courts. In a number of those cases, plaintiffs and crucial witnesses are dying. We are not persuaded that the hardship to defendants of having to go forward on this appeal without Unar-co, or the interests of judicial economy in avoiding relitigation of the issues, are strong enough to justify forcing plaintiff and a number of other plaintiffs to wait until bankrupt defendants are successfully reorganized in order to be able to pursue their claims. We proceed, therefore, to the merits.
 

 II. Refusal to Apply Admiralty Law
 

 Plaintiff’s first claim of error below is that the trial judge refused to accept the applicability of admiralty law to her claims against the defendant manufacturers. The error was particularly harmful, according to plaintiff, because it resulted in application of Maine’s comparative negligence statute,
 
 *6
 
 pursuant to which the jury found the decedent at least 50 per cent responsible for his own injuries and thus denied recovery. Under admiralty law, plaintiff claims, she would not have been denied all recovery on a negligence claim unless her husband was 100 per cent responsible for his own injuries and under a strict liability claim unless the jury found that he knowingly and unreasonably assumed the risk of his own injuries.
 

 A. Procedural Bar
 

 A threshold question is whether, as defendant urges, plaintiff is barred from raising the issue of admiralty law
 
 [1]
 
 because of the lateness of her motion to amend. A recitation of relevant events is necessary for an understanding of why we have decided to address the merits of the admiralty law issue.
 

 Plaintiff filed her complaint in June of 1978, alleging diversity of citizenship and basing her claims on Maine’s Wrongful Death and Survival Statutes. On August 10, 1981, the court set the trial date for October 19, 1981, discovery to be completed by October 1,1981. On September 30,1981, the trial date was moved back to November 2,1981, the jury to be impaneled on October 19. Plaintiff’s first formal motion to amend her complaint to allege admiralty law was made on October 9, 1981. On the same day, the trial judge held a pretrial conference at which he considered and denied plaintiff’s motion to amend. In his report of the pretrial conference he noted defendant’s objections to the motion: “that [it] had received insufficient notice to be prepared to brief and argue the merits of the jurisdictional question and that the motion was not timely filed inasmuch as the action has been pending in this Court since June 1978, that all counsel have prepared for trial of the action as a diversity action in which Maine law would apply, and the action has been assigned for trial commencing on Monday, November 2, the jury to be impaneled on Monday, October 19.” He noted that “[a]fter hearing counsel, over objection of plaintiff, the court denied plaintiff’s motion. The court endorsed its action on the original motion.”
 

 Fed.R.Civ.P. 15(a) provides that “leave [to amend] shall be freely given when justice so requires.” The Supreme Court has emphasized that the motion to amend ordinarily should not be denied “[i]n the absence of any apparent or declared reason— such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments
 
 *7
 
 previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.”
 
 Foman v. Davis,
 
 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Defendant urges that we read the trial judge’s report of the pretrial proceedings as an implicit acceptance of its arguments that a granting of the motion to amend would unduly prejudice it. Were these events all that had occurred, we would be inclined to agree that the recitation of the defendant’s arguments is, if not a declared, at least an apparent and justifiable reason for denial of the motion. Defendant insists that, in addition to the delay and expense that would be required to brief the admiralty law issue, some of the discovery already completed by it would have had to be duplicated, because admiralty law does not have Maine’s $10,000 ceiling on damages recoverable for loss of consortium. In addition, much of defendant’s trial preparation based on Maine law would have had to be discarded and a last ditch effort made to prepare for trial on the liability and damages standards applicable under admiralty law.
 

 Plaintiff, however, insists that the October motion to amend cannot be taken in isolation. She points to the facts that she had made an earlier, unsuccessful effort, in June of 1981, to allege admiralty law and the trial judge made a substantive ruling that admiralty law did not apply to her claims. Thus, she argues, it would have been fruitless for her to move to amend her complaint prior to October when the law on which the judge relied in denying her earlier request was changed; she should not be penalized for the lateness of her motion; and any threat of prejudice to the defendant could have been relieved by a granting of the motion for a continuance which she made shortly after her motion to amend.
 

 The manner in which the issue of admiralty law was earlier raised is as follows. A number of defendants in the consolidated asbestos actions, but not including the defendants here, had moved for summary judgment against the four plaintiffs whose cases had been consolidated for pretrial proceedings. The motions for summary judgment were based, among other things, on the lack of the privity of contract required under Maine law for claims based on negligence, breach of warranty and strict liability.
 
 [2]
 
 In their consolidated response to the motions for summary judgment, plaintiffs contended that the actions were governed by admiralty law and therefore not barred by a requirement of privity of contract. They noted that they would amend their complaints to allege admiralty jurisdiction should the Court sustain their contention. The court rejected plaintiffs’ contention as to admiralty law and with certain exceptions not significant here, granted the motions for summary judgment.
 

 Defendant understandably argues that this procedural history should not be considered because it was not a party technically involved in the motions for summary judgment. But the circumstances of this massive litigation, and of the court’s ruling on plaintiff’s request, cast doubt on the propriety of such a narrow interpretation. In his August 7, 1981 ruling on the motions for summary judgment, the trial judge noted that the motions were by five defendants against four of approximately 140 plaintiffs who had filed actions against various asbestos manufacturers and suppliers. Actions against a number of defendants were generally combined in the numerous pretrial proceedings held by the court. In fact, although not a party to the motions for summary judgment that prompted plaintiff’s first request that the judge find admiralty law controlling, counsel for defendant Raybestos was present at the hearing held on the admiralty issue and participated in a colloquy with the judge on the merits of plaintiff’s request. In addition, in ruling on the issue, the judge made a substantive determination which could reasonably have been interpreted by plaintiff as applying to all of the claims by plaintiff
 
 *8
 
 against the defendant asbestos suppliers and manufacturers, not just to the parties to the motion for summary judgment. The judge held that:
 

 “Federal admiralty law does not govern these actions. In the first place, plaintiffs in their complaints have not invoked admiralty jurisdiction under 28 U.S.C. § 1333(1), nor have they met the procedural requirements of Fed.R.Civ.P. 9(h). In any event, the product liability tort claims asserted by plaintiffs in these cases — the failure to warn of the dangers of asbestos — bear no ‘significant relationship’ to ‘traditional maritime activity involving navigation and commerce on navigable waters,’ a prerequisite to the maritime tort jurisdiction of the federal courts.
 
 Executive Jet Aviation, Inc. v. City of Cleveland,
 
 409 U.S. 249 [93 S.Ct. 493, 34 L.Ed.2d 454] (1972). Accord,
 
 Bailey v. Johns-Manvile [Manville] Corp.,
 
 1978 A.M.C. 1460 (E.D.Va.1978).”
 

 On October 5, 1981, the United States Court of Appeals for the Fourth Circuit ruled, in
 
 White v. Johns-Manville Corp.,
 
 662 F.2d 234 (4th Cir.1981), that federal admiralty law did apply to a claim by shipyard employees against manufacturers of asbestos products. Taking that case, justifiably, as a discrediting of
 
 Bailey v. Johns-Manville Corp.,
 
 1978 A.M.C. 1460 (E.D.Va.1978), on which the court had relied, the plaintiff moved to amend her complaint. The court denied the motions, noting that it “endorsed its action on the original motion.”
 

 The fact that the court had made, at least in part,
 
 [3]
 
 a substantive determination on the merits of the admiralty issue puts plaintiff in a somewhat stronger position than had her motion simply been denied. Although the court was certainly not bound to accept the reasoning of the Court of Appeals for the Fourth Circuit, we are inclined to agree with plaintiff that' prior to
 
 White
 
 there would have been little point in attempting to amend her complaint against the defendant whose case is at issue here. In addition, had her June request to amend been granted, she would no doubt have alleged that admiralty law governed all of her claims, including those against defendant here. Thus, we feel constrained to judge the propriety of the denial of the motion to amend as of June when she first requested it.
 

 As of June, defendant’s claim of eleventh hour prejudice has much less merit. Discovery had not been completed and it would have had adequate time to prepare for trial on the basis of admiralty law. Nor did the court rely on prejudice in denying the plaintiff’s request. It apparently determined, instead, that the requested amendment would have been futile. While we agree that futility may be a proper reason for denying a motion to amend,
 
 see Foman, supra,
 
 371 U.S. at 182, 83 S.Ct. at 230, we do not think that it was a valid one in this case. To explain why, we, like the trial judge, must reach the merits of the admiralty jurisdiction issue.
 

 B. Merits of the Admiralty Jurisdiction Issue
 

 In
 
 Executive Jet Aviation v. City of Cleveland,
 
 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), the Supreme Court rejected the traditional “strict locality” test for admiralty tort jurisdiction and required also that “the wrong bear a significant relationship to traditional maritime activity.”
 
 Id.
 
 at 268, 93 S.Ct. at 504. While it appears
 
 *9
 
 that the injury must generally still occur on navigable waters, the claim here clearly meets the locality prong of the
 
 Executive Jet
 
 test. The ships on which the plaintiff worked and where he was injured were situated in navigable waters — in the Kenne-bec River. The only issue, therefore, is whether the wrong bears a significant relationship to traditional maritime activity.
 

 In addressing this question, we note that there is already some disagreement among the circuits both as to the proper analysis and as to the ultimate resolution of the issue.
 
 See Keene Corp.
 
 v.
 
 United States,
 
 700 F.2d 836 (2d Cir.1983) (admiralty jurisdiction not proper over indemnity suit by asbestos manufacturer against the government for, inter alia, designing and specifying asbestos insulation products and failing to inspect the workplaces);
 
 Owens-Illinois, Inc. v. United States District Court for the Western District of Washington,
 
 698 F.2d 967 (9th Cir.1983) (admiralty jurisdiction not proper over claim by shipyard worker against asbestos manufacturer);
 
 White v. Johns-Manville Corp.,
 
 662 F.2d 234 (4th Cir.1981) (admiralty jurisdiction proper over claim by shipyard worker against asbestos manufacturer). For reasons set out below, we disagree, in part, with the analysis of all three courts, but we are persuaded that the result reached by the Second and Ninth Circuits is sound.
 

 The issue that appears to be creating the most confusion in this situation is whether
 
 Executive Jet
 
 requires that there be some maritime flavor to the manufacture or supply of the offending asbestos product. The Second Circuit, in
 
 Keene Corp., supra,
 
 at 844, focused on two critical elements in determining that the acts and omissions alleged were not sufficiently related to traditional maritime activity:
 

 “First, Keene does not allege that its insulation was designed specifically for maritime use.... Second, many of the roles attributed to the government and allegedly giving rise to Keene’s cause of action — the government’s sale of asbestos to Keene, its specification of asbestos as a component of insulation it purchased from Keene, its alleged breach of its duty to inspect the work place, its obligations as a promulgator of health regulations— do not bear a significant relationship to traditional maritime activities such as ‘navigation and commerce.’ ”
 

 Similarly, The Fourth Circuit, in
 
 White v. Johns-Manville,
 
 662 F.2d 234 (4th Cir.1981), found admiralty jurisdiction proper, but limited its holding to situations where “the materials used by the shipyard workers were designed, advertised, and marketed as maritime asbestos products.” 662 F.2d at 240.
 

 Our reluctance to require that there be some independent connection between the manufacture of the product and traditional maritime activity stems from the fact that in other contexts, where, for instance, a defective product causes a ship to sink, courts have extended admiralty jurisdiction to manufacturers regardless of their intent or knowledge that their product would be used on a ship. In
 
 Sperry Rand Corp. v. RCA,
 
 618 F.2d 319 (5th Cir.1980), the court found admiralty jurisdiction proper over the manufacturer of a component part of a marine gyro-pilot steering system, even though the part was not specifically manufactured for marine use. The court reasoned that it made little sense to extend admiralty jurisdiction over the injured party’s claim against the steering system manufacturer, but not over the steering system manufacturer’s claim for contribution from the manufacturer of the component part. Similarly, in
 
 Jones v. Bender Welding & Mach. Works, Inc.,
 
 581 F.2d 1331 (9th Cir. 1978), the court upheld admiralty jurisdiction over the claim of a vessel owner against a manufacturer of engines, even though it was another defendant who adapted the engine for maritime use.
 
 See also In re Queeny/Corinthos,
 
 503 F.Supp. 361, 363 (E.D.Pa.1980), where the court asserted admiralty jurisdiction over a products liability cross-claim by a vessel owner against manufacturers of component parts of the ship’s engine, giving no indication of whether those parts were designed for maritime use. The court emphasized the importance of having “power to adjudicate all of
 
 *10
 
 the demands made and arising out of the same disaster.” Most recently, the Fifth Circuit has applied similar reasoning to find admiralty jurisdiction proper in a products liability suit arising from the crash of a seaplane, despite the lack of maritime flavor to the alleged defective design of the aircraft. As the court noted,
 

 “There are ... patent difficulties in determining what kinds of ‘wrong’ are related to traditional maritime activities. If we define the ‘wrong’ as the negligent act, then it is difficult to see how defects in the design of an aircraft, faults in its manufacture or maintenance, or pilot error are maritime. Yet we, as well as other courts, have asserted admiralty jurisdiction over such claims. Those who advocate a ‘relationship of the wrong’ test really look not to the kind of wrong but to the nature of the activity in which the victim and his aircraft are engaged.
 

 In products liability cases ... [t]he place where the negligence or wrongful act occurs is not decisive. The place injury occurs and the function the injured person was performing at the time are more significant.”
 
 Smith v. Pan Air Corp.,
 
 684 F.2d 1102, 1107, 1111 (5th Cir.1980) (citations omitted).
 

 We think the approach of these courts is sound. If products liability claims are to be heard in admiralty, and it seems clear that they are,
 
 see Smith v. Pan Air Corp., supra,
 
 684 F.2d at 1111 n. 33 and cases cited therein;
 
 see also Simpson Timber Co. v. Parks,
 
 369 F.2d 324 (9th Cir.1966),
 
 vacated and remanded,
 
 388 U.S. 459, 87 S.Ct. 2115, 18 L.Ed.2d 1319 (1967),
 
 on remand,
 
 390 F.2d 353 (9th Cir.1968) (implicit Supreme Court approval of admiralty’s acceptance of land based products liability law), then whatever advantage accrues from a uniform national law governing those cases would be severely undercut by distinguishing between manufacturers according to whether they designed or intended their products for maritime use.
 

 For similar reasons, we find misplaced any reliance on whether the contract between the manufacturer and shipbuilder was for ship construction, which is non-maritime, or for ship repair, which is maritime. Determining what would be the nature of a contract dispute between Bath Iron Works and Raybestos sheds little light on the nature of this products liability claim.
 
 [4]
 
 Several courts apparently agree.
 
 See, e.g., Jig the Third Corp. v. Puritan Marine Ins. Corp.,
 
 519 F.2d 171, 174 (5th Cir.1975) (“When an oceangoing shrimpboat sinks in 15 fathoms of water in the Gulf of Mexico and the sinking is allegedly tortious, there is maritime activity, and the tort, if recognized by the law, is maritime in nature.... This would be true even though the conduct complained of may have been negligent construction or defective design and may have occurred ashore.”)
 
 Watz v. Zapata Off-Shore Co.,
 
 431 F.2d 100, 112-14 (5th Cir.1970);
 
 Sears, Roebuck & Co. v. American President Lines, Ltd.,
 
 345 F.Supp. 395, 402 (N.D.Cal.1971);
 
 Taisho Fire & Marine v. Vessel Montana,
 
 335 F.Supp. 1238, 1239 (N.D.Cal.1971);
 
 In re Alamo Transp. Co.,
 
 320 F.Supp. 631, 634 (S.D.Tex.1970).
 

 Concluding, therefore, that it is not fatal to plaintiff’s allegation of admiralty jurisdiction that hers is a products liability claim against a manufacturer with no independent connection to maritime activity, we turn to plaintiff’s decedent’s activity.
 

 Defendant concedes that if the asbestos products had caused a ship to sink, or had caused injury to a crewmember or passenger, admiralty jurisdiction would be proper. It argues, however, that the decedent’s work was not significantly related to traditional maritime activity involving navigation and commerce, as required by the Court in
 
 Executive Jet;
 
 that injuries to shipyard workers are not a traditional concern of admiralty law; and that the policy justifications for a uniform maritime law do
 
 *11
 
 not support admiralty jurisdiction in this case. After much reflection, we agree.
 

 The Court in
 
 Executive Jet
 
 emphasized the traditional concerns and expertise of admiralty courts:
 

 “The law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go. That law deals with navigational rules — rules that govern the manner and direction those vessels may rightly move upon the waters. When a collision occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage.” 409 U.S. at 270, 93 S.Ct. at 505.
 

 Included within those traditional concerns of admiralty are the care and safety of those exposed to the hazards of maritime service. One of the justifications the
 
 Executive Jet
 
 Court discussed for abandoning the “strict liability” rule for maritime torts is the number of times the courts and Congress have had to create exceptions to the rule, particularly in cases of personal injury, where the tort had no maritime locality, but did bear a relationship to “maritime
 
 service,
 
 commerce, or navigation.” 409 U.S. at 259, 93 S.Ct. at 500 (emphasis added). As examples, the Court cited the application of the Jones Act to injuries to a seaman on land, because of the seaman’s connection with maritime commerce,
 
 see O’Donnell v. Great Lakes Dredge & Dock Co.,
 
 318 U.S. 36, 43, 63 S.Ct. 488, 492, 87 L.Ed. 596 (1943), and the extension of the doctrine of unseaworthiness to cover injuries sustained on land by a seaman or a longshoreman,
 
 see Gutierrez v. Waterman S.S. Corp.,
 
 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). The court also cited
 
 Atlantic Transport Co.
 
 v.
 
 Imbrovek,
 
 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914), as a case in which the claim had a sufficiently close relationship to traditional maritime activity.
 

 In
 
 Atlantic Transport Co.,
 
 the Court upheld admiralty jurisdiction over a stevedore’s negligence claim against his employer. The Court cited the locality rule, but then went on to say that:
 

 “Even if it be assumed that the requirement as to locality in tort cases, while indispensable, is not necessarily exclusive, still in the present case the wrong which was the subject of the suit was, we think, of a maritime nature....
 

 The libelant was injured on a ship, lying in navigable waters, and while he was engaged in the performance of a maritime service. We entertain no doubt that the service in loading and stowing a ship’s cargo is of this character. Upon its proper performance depend in large measure the safe carrying of the cargo and the safety of the ship itself; and it is a service absolutely necessary to enable the ship to discharge its maritime duty. Formerly the work was done by the ship’s crew; but, owing to the exigencies of increasing commerce and the demand for rapidity and special skill, it has become a specialized service devolving upon a class ‘as clearly identified with maritime affairs as are the mariners.’ ”
 
 Id.
 
 at 61-62, 34 S.Ct. at 735 (citations omitted).
 

 Thus, it appears that personal injuries to seamen and others doing seamen’s work do fall within the traditional concerns of admiralty law and are claims over which admiralty tort jurisdiction would be proper. The remaining issue, however, is whether plaintiff’s decedent should be considered to have been performing traditional maritime service when he was injured. On that question, we find helpful the Supreme Court’s decisions regarding which workers should be entitled to the special admiralty-confined warranty of seaworthiness and for what sorts of injuries.
 

 The justification for admiralty’s special no-fault protection for maritime injuries is that:
 

 
 *12
 
 “Seamen are the wards of admiralty, and the policy of the maritime law has ever been to see that they are accorded proper protection by the vessels on which they serve.... [Thus] the owners owe[ ] to the seamen the duty of furnishing a seaworthy vessel and safe and proper appliances in good order and condition; and ... for failure to discharge such duty there [is] liability on the part of the vessel and her owners to a seaman suffering injury as a result thereof.”
 
 The State of Maryland,
 
 85 F.2d 944, 945, 4th Cir.1936,
 
 quoted in Seas Shipping Co. v. Sieracki,
 
 328 U.S. 85, 91-92 n. 9, 66 S.Ct. 872, 875-876 n. 9, 90 L.Ed. 1099 (1946).
 

 Two observations may be made about the application of this policy. The first is that unseaworthiness can arise not only from something as nautical as a faulty anchor windlass but from something as un-maritime as the presence on a ship of a hazardous chemical.
 
 See, e.g., Smith v. Ithaco Corp.,
 
 612 F.2d 215 (5th Cir.1980) (unseaworthiness claim based on seaman’s exposure to benzene fumes escaping from the ship’s storage tanks);
 
 Martinez v. Dixie Carriers, Inc.,
 
 529 F.2d 457 (5th Cir.1976) (unseaworthiness claim based on exposure to noxious fumes escaping from the chemical tank of a barge).
 

 A second, and perhaps more immediately pertinent observation is that the policy protects not only seamen but, by judicially created extension, those who are serving the same functions as seamen would serve; otherwise a vessel owner might be able to frustrate the policy by subcontracting chunks of a seaman’s job to others. But the limits of the extension are narrowly circumscribed.
 

 The seaworthiness remedy has been extended to some harbor workers,
 
 see Seas Shipping Co. v. Sieracki,
 
 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946);
 
 Pope & Talbort, Inc. v. Hawn,
 
 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953), but only if those harbor workers were injured while doing work traditionally done by members of the crew and thus, presumably, subject to many of the same hazards as seamen,
 
 see United New York and New Jersey Sandy Hooks Pilots Ass’n v. Halecki,
 
 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959).
 
 See also West v. United States,
 
 361 U.S. 118, 80 S.Ct. 189,4 L.Ed.2d 161 (1959) (focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done);
 
 Waganer v. Sea-Land Service, Inc.,
 
 486 F.2d 955, 958 (5th Cir.1973) (two-fold requirement for unseaworthiness recovery; “(i) the ship in question must have been in navigational status, and not ‘dead’, which in turn depends upon whether the contracted work is minor or major, and who has custody and control of the ship while the work is being done; and (ii) the pattern of repair must reflect work traditionally and ordinarily done by seamen, excluding persons performing such tasks as making major repairs requiring drydocking or special skills”).
 

 The distinctions drawn in the seaworthiness context, according to the work performed by the injured party and the hazards encountered by him, counsel against admiralty jurisdiction in this case. Under the tests set out above, plaintiff’s decedent would plainly be excluded. The ships on which he worked were out of navigation and the work was major, requiring special equipment and skills.
 
 [5]
 
 It was not work
 
 *13
 
 traditionally done by members of the crew. More important, if the reason for admiralty’s special concern for the care and safety of seamen is that they are exposed to the peculiar hazards of the sea and a vessel’s equipment, then the dangers faced by a shipyard worker installing asbestos insulation are scarcely traditional concerns of admiralty or is there any reason to expect an admiralty court to possess expertise in addressing those dangers.
 

 Our judgment is reinforced by other concerns expressed by the Supreme Court in cases defining the reach of admiralty jurisdiction. Both in
 
 Executive Jet
 
 and, more recently, in
 
 Foremost Insurance Co. v. Richardson,
 
 - U.S. -, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), the Court emphasized the need for uniform rules as a major factor in determining whether admiralty jurisdiction should extend to a particular dispute. In contrast to the problems of choice of forum, choice of law and conflicting rules of navigation foreseen in those cases, we see no similar burdens on the administration of justice or on the flow of maritime commerce that will result from a denial of admiralty jurisdiction in this case. The only inconsistency that will result is that some harbor workers — those injured while doing the work of seamen — may be able to recover in admiralty for their injuries while others will be left to the remedies provided by state law.
 

 We acknowledge that Congress, in enacting and expanding the reach of the Longshoremen’s and Harbor Workers’ Compensation Act (LHWCA), 33 U.S.C. § 902(3), has provided a uniform compensation remedy for all harbor workers, regardless of whether, under the Supreme Court’s test, they would have been considered to have been doing the work of seamen. We also acknowledge that the broad reach of that statute reflects in part a solution to the confusion that resulted from trying to distinguish between harbor workers for application of state or federal compensation remedies.
 
 See Calbeck v. Travelers Ins. Co.,
 
 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962). It may be that Congress will make a similar determination to extend admiralty tort jurisdiction to all harbor workers, regardless of their specific activity. At this point, however, we are guided by the fact that Congress has not swept so broadly. In addition to their compensation remedy, harbor workers are entitled, under section 905(b) of the LHWCA, 33 U.S.C. § 905(b), to recover against the vessel and vessel owner for negligence. In this case, however, plaintiff asserts no claim directly against a vessel owner, nor is there any assertion that the vessel owner was negligent. Moreover, the risk encountered by plaintiff’s decedent is not a risk, arising from the loading or operation of a vessel, against which those on the vessel are typically protected by the vessel owner. It is, rather, the same risk as that encountered by a number of workers on a shoreside construction project.
 

 Whatever anomalous results may follow from distinguishing between harbor workers according to the maritime nature of the hazards they encounter are at least offset, if not outweighed, by the anomalous results of treating construction workers injured by asbestos poisoning differently depending on whether they were installing asbestos in a ship or in an office building overlooking the harbor. The state has an interest in providing uniform treatment to these two like workers. We are, therefore, guided by the insistence of the Court in
 
 Victory Carriers, Inc. v. Law,
 
 404 U.S. 202, 212, 92 S.Ct. 418, 425, 30 L.Ed.2d 383 (1971), that courts of admiralty not intrude without specific Congressional authorization into an area in which the state has an interest and that otherwise would be governed by state law. In a context similar to ours, the Court rec
 
 *14
 
 ognized the state’s interest in the care of harbor workers and the availability of state laws to provide compensation for their injuries. The Court noted that:
 

 “Perhaps such laws provide inadequate benefits, but we are poorly positioned to conclude that they do or for that reason to give special remedies to longshoremen when other employees operating forklifts for other employers in perhaps equally hazardous circumstances are left to the mercies of state law. Claims like these are best presented in the legislative forum, not here.”
 
 Id.
 
 at 215-16, 92 S.Ct. at 426-27.
 

 We conclude that the district court correctly held that plaintiff’s claim was not cognizable in admiralty. We acknowledge that, because of the importance we assign to the activity of the person suffering tor-tious injury, distinguishing between activities that are maritime and those that are not approaches medieval nicety. In this case, however, the conclusion that decedent’s activity was not “traditionally maritime” is indicated by a congeries of factors — the vessel, whether under construction or laid up for repairs, was passive and temporarily incapable of acting as such; the work being done was a major project involving specialized tools and skills, both in kind and magnitude far beyond that traditionally done by a ship’s crew; and the hazards exposed could not be said to be peculiar to maritime navigation. Moreover, no recognized policy objective of avoiding onerous burdens on maritime traffic through a uniform rule is discernible. Nor does the legislative provision of coverage through the LHWCA supply an affirmative thrust for a judicial weakening of
 
 Executive Jet’s
 
 requirement of “traditional maritime activity.” Additionally, any anomalous results from differentiating between land based harbor workers on the basis of their activity at the time of their injury are more than balanced by the asymmetries which would result from a decision applying state or admiralty law to an artisan depending on whether his workplace was supported by land or navigable water. Finally, the demands of federalism are well served by declining to intrude unnecessarily into an area in which the state has an interest and over which state law is capable of exercising control.
 

 III.
 
 Dismissal of. Strict Liability Count
 

 A. Change in State Law
 

 In addition to challenging the trial court’s refusal to apply admiralty law to her claims, plaintiff urges that the court erred in dismissing her strict liability count based on Maine law. At the close of all of the evidence, defendant Raybestos moved to dismiss count two of plaintiff’s complaint, which alleged a cause of action in strict products liability under Maine law. The court granted the motion, citing lack of evidence that plaintiff’s decedent’s death could have been caused by exposure to asbestos products supplied by Raybestos to Bath Iron Works subsequent to October 3, 1973, the effective date of the Maine Strict Products Liability Statute.
 

 The court assumed that the law of Maine was clear that a claim of strict liability could be asserted only with respect to a product sold after October 3, 1973. In its August 7, 1981 ruling, the court had granted summary judgment on the strict liability count to all of the moving defendants who had not supplied asbestos products after October 3, 1973. The court had relied on
 
 Burke v. Hamilton Beach Division,
 
 424 A.2d 145, 148 (Me.1981), in which Maine’s Supreme Judicial Court said that in light of clear legislative intent that none of Maine’s recently enacted products liability statutes have retrospective effect “we are compelled to hold that U.C.C. section 2-318 and sections 161 and 221 of title 14 [the strict liability statute] do not apply to claims where any of the operative events, whether they are sales transactions or tort events, have occurred before the effective dates of the respective statutes.”
 

 In colloquy with counsel for Raybestos’ co-defendant, Unarco, concerning Unarco’s
 
 *15
 
 request for a directed verdict,
 
 [6]
 
 the court acknowledged that “your position is that you are entitled to a directed verdict from the strict liability count inasmuch as Maine did not recognize the strict liability until October 3, 1973. And
 
 Burke
 
 and
 
 Hurd [v. Hurd,
 
 423 A.2d 960 (Me.1981)] make clear that statute is not to be retroactively applied.” In response to that colloquy, plaintiff’s counsel agreed that “[u]nder the present state of the Maine law we don’t believe that we’d have any appropriate response to [Unarco counsel’s] position that he’s taken on the strict liability .... ”
 

 After the trial in this case, the Maine Supreme Judicial Court decided
 
 Adams v. Buffalo Forge,
 
 443 A.2d 932 (Me.1982). The court held that strict liability applies to all injuries occurring after the effective date of the statute, regardless of the date of the sale of the allegedly defective or unreasonably dangerous product. Plaintiff urges that
 
 Adams
 
 reflects a change in law which we must apply on appeal. Defendant counters that
 
 Adams
 
 did not change the law, because, as the Supreme Judicial Court pointed out in
 
 Adams,
 
 the language in
 
 Burke
 
 regarding the strict liability statute, and on which the trial court relied, was dicta. In addition, defendant argues that plaintiff should be estopped from asserting this issue on appeal because she consented to the court’s reliance on the
 
 Burke
 
 rule.
 

 We are not persuaded by either of defendant’s arguments. It is true that in
 
 Adams,
 
 the court insisted that it was not overruling prior Maine law regarding the reach of the strict liability statute, and that language in
 
 Burke
 
 to the contrary was merely dicta.
 
 [7]
 
 To deny plaintiff’s appeal on that basis, however, seems to us an evasive reading of the rule that a change in the law between a trial and an appeal requires the court on appeal to apply the new law. The trial judge certainly and, we think, reasonably assumed that the
 
 Burke
 
 rule was the law in Maine and, on that basis, accepted it as the law of the case. We think plaintiff is entitled to have the proper rule, as expressed in
 
 Adams,
 
 applied on appeal.
 
 See Bradley v. Richmond School Board,
 
 416 U.S. 696, 714, 94 S.Ct. 2006, 2017, 40 L.Ed.2d 476 (1974) (quoting
 
 Thorpe v. Housing Authority of the City of Durham,
 
 393 U.S. 268, 281, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969) (absent manifest injustice to the parties, “ ‘an appellate court must apply the law in effect at the time it renders its decision.’ ”)).
 

 If
 
 Adams
 
 is not seen as reflecting a change in the law, but only stating what it was, then the trial court’s ruling on the motion to dismiss was simply error.
 

 Defendant relies on the doctrine of “invited error” to urge that plaintiff be barred from complaining of that error. It points to plaintiff’s statement to the court that she had no response to defendant Unarco’s position on the strict liability issue.
 

 We agree that, in general, a party may not appeal from an error to which he contributed, either by failing to object or by affirmatively presenting to the court the wrong law.
 
 See McPhail v. Municipality of Culebra,
 
 598 F.2d 603, 607 (1st Cir.1979). That rule, however, assumes that the fault for the error should lie on the appealing party. In this case, we can find little basis for holding anyone at fault — either the parties or the court. The exercise of all diligence in researching Maine law on
 
 *16
 
 the issue led to the conclusion accepted by all parties and the court — that a claim in strict liability would not lie against a manufacturer who did not supply products after the effective date of the statute. The Supreme Judicial Court has now made clear that that conclusion was error. Whether we approach this new clarity as a change in law or as simply a signalling that the court’s ruling was error, we think that plaintiff is entitled to have the correct Maine law applied on appeal.
 
 [8]
 

 B. Harmless Error
 

 Defendant contends that even if the trial court’s dismissal of plaintiff strict liability count was error, that error was harmless because the jury’s finding that the decedent’s fault was equal to or greater than that of defendant would have barred plaintiff from recovering under a strict liability theory. Defendant bases its argument on the assumption that Maine’s comparative fault statute, 14 M.R.S.A. § 156, on which the jury was charged regarding plaintiff’s negligence claim, would also be applicable to a claim based on Maine’s strict liability statute.
 

 The strict liability statute, 14 M.R.S.A. § 221, was passed in 1973. Since that time, the Maine courts have not addressed the applicability of § 156, enacted eight years earlier, to claims brought under § 221. In
 
 Wing v. Morse,
 
 300 A.2d 491 (Me.1973), decided just prior to the enactment of § 221, the Maine Supreme Judicial Court expressly declined to decide whether § 156 should apply to a claim based on strict liability.
 
 Id.
 
 at 500 n. 10.
 

 Plaintiff urges that since § 221 adopts the language of the Restatement (Second) of Torts § 402A, we should assume that Maine law also adopts the contributory negligence rule proposed in that section of the Restatement. Comment “n” to section 402A provides as follows:
 

 “n.
 
 Contributory negligence.
 
 Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases (see § 524) applies. Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, And nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.”
 

 Under this rule, the jury would deny plaintiff recovery only if it found that her decedent voluntarily and unreasonably assumed the risk of his injury. Since the jury was charged only under Maine’s comparative negligence statute, under which it could deny plaintiff recovery if it found her decedent as negligent as the defendant, there is no way to know whether the jury would also have denied recovery under the comment “n” assumption of the risk standard. Thus, plaintiff argues, we should remand for a new trial.
 

 Defendant counters with a list of jurisdictions that have ruled that their comparative negligence statutes do apply to strict liability actions. It also urges that § 156 by its terms applies to § 221. Its reasoning is that § 156 applies to claims based on damage as a result of fault. Fault is defined as
 
 *17
 
 “negligence, breach of statutory duty, or other action or omission which gives rise to a liability in tort .... ” A violation of § 221 is both a form of “liability in tort”,
 
 see Adams v. Buffalo Forge, Co., supra,
 
 443 A.2d at 940, and a “breach of statutory duty.” Ergo, § 156 applies to § 221.
 

 While there is logic to defendant’s argument, we are not persuaded that the answer to this question is clear. We trust, however, that the district court on remand will, with the aid of briefing by the parties, or with the guidance of the Maine Supreme Judicial Court, should it deem certification of the question advisable, be able to determine whether Maine’s comparative negligence statute should apply to a claim based on strict liability and, therefore, whether the dismissal of the strict liability count was harmless error. If not, the court should grant Pretrial on both the liability and damages aspects of the strict liability count.
 

 IV. Motion to Strike Comparative Negligence Defense and for a New Trial
 

 Plaintiff’s final claim of error below is that the court erred in denying her motions to strike defendant’s comparative negligence defense and for a new trial on the basis of insufficient evidence that the decedent was guilty of negligence that was the proximate cause of his death or that his negligence was equal to or greater than the negligence of the defendant.
 

 We will treat the motion to strike as a motion for a directed verdict on the issue of the decedent’s comparative negligence.
 
 [9]
 
 Such a motion should be granted only if, as a matter of law, no conclusion but one can be drawn.
 
 See Rios v. Empresas Lineas Maritimas Argentinas, 575
 
 F.2d 986, 990 (1st Cir.1978). The burden on a moving party is thus even heavier than that on a party moving for a new trial, which motion should be granted if the trial court is convinced that the verdict is against the weight of the evidence and that a miscarriage of justice would otherwise obtain.
 
 Id.;
 
 9 C. Wright & A. Miller, Federal Practice & Procedure: Civil, Sec. 2531 (1971).
 

 The court denied plaintiff’s motion to strike without opinion. After the jury returned its verdict, however, the court held a hearing on plaintiff’s motion for a new trial and for judgment notwithstanding the verdict. The court rehearsed the testimony and evidence presented at trial. It concluded that:
 

 “Based upon that review, this Court is firmly convinced that the jury was justified in reaching the determinations they did and therefore that neither a new trial nor a judgment notwithstanding the verdict is warranted. The evidence was mixed. Nevertheless, there was ample testimony at the trial, and other evidence, from which the jury properly could conclude that Blaine Austin either knew or should have known there were health hazards associated with breathing asbestos dust. See, for example, the testimony of Victor Leask, John Conley and Francis Pinette. See, also, Defendants’ Exhibit No. 7, the memorandum dated May 25, 1953, from Adams to Conley.
 

 There was also ample testimony at the trial from which the jury could conclude that Blaine Austin failed to exercise due care for his own safety. See, for example, the testimony of Francis Pinette, Dennis Fraser and John Conley that Blaine Austin did not wear a respirator, though respirators were available
 
 [10]
 
 and Bath Iron Works had cautioned its employees to use them when working in closed spaces.
 

 For the above reasons, this Court cannot say that the verdict returned by the jury “was clearly against the weight of
 
 *18
 
 the evidence,”
 
 Rios v. Empress [sic] Lineas Maritimas Argentinas,
 
 supra, 575 F.2d at 991 (fn. omitted) and at 990. The motion for a new trial is therefore denied, and since the standard which must be met to justify a judgment notwithstanding the verdict is even higher than that which must be met to justify the granting of a new trial, it necessarily follows that the motion for a judgment notwithstanding the verdict must also be and it is therefore denied.”
 

 Our review of the court’s rulings is limited. A motion for a new trial is addressed to the sound discretion of the trial court and will be reversed only for abuse of that discretion.
 
 Rios v. Empresas Lineas Maritimas Argentinas, supra,
 
 575 F.2d at 990.
 
 See also DeVasto v. Faherty,
 
 658 F.2d 859, 860 (1st Cir.1981). Its ruling on the motion for judgment n.o.v. should be reversed only if viewing the evidence in the light most favorable to the nonmoving party only one conclusion can be reached.
 
 Id.
 
 Having reviewed the evidence produced at trial and the trial court’s own careful consideration of that evidence, we cannot say that the court abused its discretion in denying a motion for a new trial or that the evidence was insufficient as a matter of law to support a finding that the negligence of plaintiff’s decedent was a proximate cause of his own death.
 

 Conclusion
 

 In conclusion, we affirm the ruling of the district court that admiralty law did not apply to plaintiff’s claims. We remand the case, however, for the court to determine, either with the aid of briefing by the parties or by certifying the question to the Supreme Judicial Court of Maine, whether Maine’s comparative negligence statute should be applied to a claim based on 14 M.R.S.A. § 221. If so, the court’s dismissal of the strict liability count was harmless error. If not, the case should be retried under Maine law and the jury be given an opportunity to determine whether defendant was strictly liable for its failure to warn of the dangers of asbestos and what proportion, if any, of the damages should be offset by plaintiff’s decedent’s own negligence.
 

 Vacated and remanded for proceedings consistent with this opinion.
 

 [1]
 

 . In the memorandum accompanying her motion to amend, plaintiff used “admiralty law” and “admiralty jurisdiction” interchangeably. She expressly noted, however, that “[b]y arguing for a determination that admiralty law applies, plaintiff by no means intends to waive [her] right to a jury trial. Since there is also diversity jurisdiction, plaintiff is entitled to a trial by jury.
 
 Romero v. International Terminal Operating Co.,
 
 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 769 (1959).” It appears, therefore, that what plaintiff wanted was to have admiralty law control her action which was properly before the court as a suit based on diversity jurisdiction.
 

 Executive Jet
 
 set out a test for the invocation of admiralty jurisdiction, rather than for the application of admiralty law. Nevertheless, for our purposes, it appears that the tests are the same, since, in general “[o]nce admiralty jurisdiction is established, then all of the substantive rules and precepts peculiar to the law of the sea become applicable.”
 
 Brance v. Shumann,
 
 445 F.2d 175, 178 (5th Cir.1971). This is true even when the plaintiff decides to pursue her claim in the civil side of a federal court or in a state court.
 
 See Pope & Talbot, Inc. v. Hawn,
 
 346 U.S. 406, 409-11, 74 S.Ct. 202, 204-06, 98 L.Ed. 143 (1953);
 
 Chelentis v. Luckenbach S.S. Co.,
 
 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171 (1918); G. Gilmore & C. Black, The Law of Admiralty § 6-5 at 279 (2d ed. 1975). The Supreme Court has recognized that the states do not lose all concern for their land-based workers, even though their injuries may be considered maritime.
 
 See Kossick v. United Fruit Co.,
 
 365 U.S. 731, 739, 81 S.Ct. 886, 892, 6 L.Ed.2d 56 (1961). Thus, admiralty sometimes borrows or draws on state law in deciding issues in which the state has a strong interest.
 
 See, e.g., In re Dearborn Marine Service, Inc.,
 
 499 F.2d 263, 277 n. 27 (5th Cir.1974), and cases cited therein. While state law may supplement admiralty law, however, it may not flatly contradict it and is generally referred to only when it affords greater protection to maritime employees than that afforded by admiralty law.
 
 See Pope & Talbot, Inc. supra,
 
 346 U.S. at 409-10, 74 S.Ct. at 204-05; Gilmore & Black,
 
 supra,
 
 § 1-17 at 49.
 

 [2]
 

 . For further discussion of the privity requirement for a claim based on Maine’s strict liability statute see Section III A,
 
 infra.
 

 [3]
 

 . The court’s other concern, that plaintiffs had not invoked admiralty jurisdiction under 28 U.S.C. § 1333(1), nor had they met the procedural requirements of Fed.R.Civ.P. 9(h), was misplaced. A plaintiff may plead only diversity jurisdiction but also allege that admiralty law governs.
 
 See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,
 
 369 U.S. 355, 359-60, 82 S.Ct. 780, 783-84, 7 L.Ed.2d 798 (1962);
 
 Pope & Talbot, Inc. v. Hawn,
 
 346 U.S. 406, 409-11, 74 S.Ct. 202, 204-06, 98 L.Ed. 143 (1953);
 
 Edynak v. Atlantic Shipping, Inc. CIE. Chambon,
 
 562 F.2d 215, 221 n. 11 (3d Cir. 1977); 7A J. Moore, Moore’s Federal Practice ¶¶ .53 [2] — [3] at 389;
 
 id.,
 
 ¶ ,59[3] at 418.
 
 See also
 
 note 1,
 
 supra.
 
 The court’s ruling also probably accounts for the fact that in her October 9, 1981 motion to amend, plaintiff pleaded admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1); 46 U.S.C. § 740 and Fed.R.Civ.P. 9(h). Contrary to the suggestion of defendant, it is clear from her accompanying memorandum that she did not intend, by invoking Fed.R. Civ.P. 9(h), to deprive defendant of a jury trial.
 

 [4]
 

 . We agree that the traditional admiralty distinction between ship building and ship repair may shed light on the nature of the injured worker’s activity and thus be relevant to the inquiry required by
 
 Executive Jet. See
 
 note 5,
 
 infra.
 
 Our concern here is with a distinction based on the nature of the manufacturer’s activity.
 

 [5]
 

 . The Ninth Circuit has reached a similar conclusion by focusing on the ship repair/ship construction distinction used to determine whether a contract dispute is in admiralty or at law.
 
 See Owens-Illinois, supra,
 
 at 970;
 
 see also Hollister v. Luke Construction Co.,
 
 517 F.2d 920, 921 (5th Cir.1975) (because a contract to build a ship is non-maritime, an injury to a welder during the course of that construction lacks maritime flavor). While we agree that the contract cases are relevant and that the Supreme Court has in the past relied on them to distinguish between workers whose connection to maritime activity was too tenuous to warrant displacing state law,
 
 see Grant Smith Porter Co. v. Rohde,
 
 257 U.S. 469, 42 S.Ct. 157, 66 L.Ed. 321 (1922), reliance on them, rather than on the work actually performed by the injured party may lead to arbitrary distinctions.
 
 See Halecki, supra,
 
 358 U.S. at 617-18, 79 S.Ct. at 519 (“It avails nothing to say that the decedent was an ‘electrician’ and that many modem ships carry electricians in their crew.
 
 Pope & Talbot v. Hawn
 
 explicitly teaches that such
 
 *13
 
 labels in this domain are meaningless.... It is scarcely more helpful to indulge in the euphemism that the decedent was ‘cleaning’ part of the ship, and to say that it is a traditional duty of seamen to keep their ship clean. The basic fact is ... that the decedent ‘was not doing what any crew member had ever done on this ship or anywhere else in the world so far as we are informed.’ ”). We note, for instance, that in this case, plaintiffs decedent did some “repair” work.
 

 [6]
 

 . Unarco moved for a directed verdict on the strict liability count at the close of the plaintiff’s evidence. By agreement of counsel, Raybestos reserved its motion until the close of all of the evidence since a portion of plaintiffs evidence against Raybestos was introduced after plaintiff rested to accommodate a Raybes-tos witness. It is clear from the record that at the time of Raybestos’ motion, both the court and the parties maintained the same assumptions as to the limitation of Maine’s strict liability statute to products supplied after the effective date of the statute. Plaintiffs objection to Raybestos’ motion was based on what it considered to be sufficient evidence that Raybestos had supplied asbestos products to Bath Iron Works after October 3, 1973.
 

 [7]
 

 . The issue in
 
 Burke
 
 was the retroactivity of the two statutes abolishing the privity requirement in negligence and breach of warrant suits. The court’s discussion of 14 M.R.S.A. § 221, the strict liability statute, was in the context of a general survey of legislative intent regarding changes in Maine’s products liability law.
 

 [8]
 

 . Defendant points us to a recently decided Maine case,
 
 Cuthbertson v. Clark Equipment Co.,
 
 448 A.2d 315, Me.1982, in which the plaintiff requested the court to remand for a new trial on the strict liability count of her complaint in light of
 
 Adams v. Buffalo Forge Co.
 
 The court declined to do so, because plaintiff had “agreed to forego its claim on strict liability” in light of
 
 Burke.
 
 Even were we bound by the reasoning of the Maine court on this issue, we would find the cases easily distinguishable. The court in
 
 Cuthbertson
 
 noted that because of plaintiffs voluntary decision to forego the strict liability count, the court had never had an opportunity to rule on the issue. In the case before us, plaintiff, although concurring in the court’s reading of
 
 Burke,
 
 specifically requested that the strict liability count be left. The court then formally dismissed the count and it is from that ruling that plaintiff appeals.
 

 [9]
 

 . The motion to strike might also be seen as a challenge based on the rule that submission of an instruction to the jury that is unsupported by the evidence is error. See
 
 Gillentine v. McKeand,
 
 426 F.2d 717, 723 (1st Cir.1970). In either case, the review is of the sufficiency of the evidence and the trial court is constrained by the rule that the evidence is insufficient to go to the jury only when, as a matter of law, no conclusion but one can be drawn.
 

 [10]
 

 . In her memorandum in support of her motion for a new trial and on appeal, plaintiff urges that there was no evidence that any respirator available to decedent at the time he was exposed to the asbestos that caused his death
 
 *18
 
 could have prevented him from contracting me-sothelioma. The court did not specifically address that claim. A finding for her on that point however, would have required the court to agree with her as to the length of the latency period for mesothelioma — since her argument is based on the type of respirators available in the 1950s, twenty years before the decedent’s death, and as to whether mesothelioma is dose-related — since her argument assumes that only a respirator that kept out 100% of the asbestos dust would have been effective in preventing decedent’s death. We take the court’s ruling that respirators were available as a recognition that testimony on both points was inconclusive and therefore, that the jury could find that use of the respirators that were available would have reduced the decedent’s chances of contracting the disease.