**In re Nicholas CHRISTAKIS, Debtor.**

**Nicholas Christakis, Plaintiff,**

v.

**Gerald McMahon, Defendant.**

**Bankruptcy No. 01–42828–HJB.**
**Adversary No. 01–4301–HJB.**

United States Bankruptcy Court,
D. Massachusetts.

March 28, 2003.

William F. Markley, Quincy, MA, for debtor.

Jon Kurland, Kurland & Grossman, Chelmsford, MA, for defendant.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court is the complaint of the plaintiff/debtor, Nicholas Christakis (the "Debtor") against the defendant Gerald McMahon ("McMahon"). Pursuant to 11 U.S.C. § 362(h),[1] the complaint urges the

---

1. Section 362(h) of the Bankruptcy Code provides: "[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

11 U.S.C. § 362(h). The Court further notes that the controversy could have been filed as a contested matter. None of the categories of Federal Rule of Bankruptcy Procedure 7001 are applicable.

Court to find and rule that McMahon violated the automatic stay under § 362(a). Indeed, this Court does find a violation, but not one by McMahon. Instead, the Court finds that the Debtor has, in every appropriate sense of the word, violated the automatic stay and used it to undermine the salutary purposes of the Bankruptcy Code and abuse the processes of this Court.

## I. FACTS

The following constitute this Court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr.P. 7052.

The Debtor filed a Chapter 7 petition in this Court on April 26, 2001. Together with the petition, he filed a matrix of his creditors. On May 16, 2001, the Debtor filed his bankruptcy schedules and statement of affairs. In Schedule I (Current Income of Individual Debtors), the Debtor described his occupation as the President of Financial Funding, a job which he had held for "less than 6 months." The location of that enterprise was set forth as 265 Boston Road, Billerica, Massachusetts. Notwithstanding his alleged employment at Financial Funding, the Debtor represented that he drew no net income from that business. Rather, his income of $1,300 per month came from "family support," and the commissions of $5,000 per month earned at Financial Funding were "plowed back into the business." In Schedule J (Current Expenditures of Individual Debtors), the Debtor reported personal expenses of almost precisely $1,300 per month and $13,075.00 in expenses from an unspecified business, presumably Financial Funding. But the income of that business was not listed.

In the Debtor's Schedule B, the Debtor answered "None" to the question posed in Schedule B(12) (the existence of stock and interests in incorporated and unincorporated businesses); yet he answered Schedule B(33) (other personal property of any kind not already listed) as "Majority Shareholder of 'Financial Funding'." The shareholder interest was represented to have no value, as the business was allegedly operating at a loss. Indeed, in his Statement of Affairs, the Debtor claimed to have had no income for the years 2000 or 2001.[2] The Debtor also failed to report his interest in an entity called "One Stop Financial, Inc.," in which he testified at trial to have an ownership interest.

In Schedule F (Creditors Holding Unsecured Nonpriority Claims), the Debtor listed both personal and business creditors, among them "McMahon Electric," holding a "fixed and liquidated" claim. McMahon Electric was listed without an address both on the Debtor's matrix of creditors and in Schedule F, and, for that reason, the Clerk's Office records reflect no notice of the case filing being sent to that entity. There was no indication on Schedule F that the claim of McMahon Electric was in any way disputed, nor any indication in the Debtor's answer to Question 4 of his Statement of Affairs (asking that the debtor list all suits to which the debtor was a party within a year prepetition) that the McMahon Electric claim was the subject of any litigation.

The Debtor's foregoing statements with respect to McMahon were false. The Debtor well knew McMahon's address as the claim was an issue of heated dispute, the subject of prepetition state court litigation. At some time prior to October, 2000,

---

**2.** In testimony elicited during the instant trial, a Jamie Guerrero, employed by a certain BLS Funding, a company run by Speedydollars.com, testified that the Debtor has been employed there as the leader of a sales team. That employment was not listed on the Schedules.

McMahon had provided electrical services to the premises at 265 Boston Road in Billerica on behalf of a new enterprise formed by the Debtor and a Peter Giannakopoulos. He had quoted $4,280 for those services, however, he had received only $2,100 on account. When he realized that no more would be paid, on October 17, 2000, McMahon filed suit against the Debtor for the balance in the Lowell District Court, Small Claims Division.

The Debtor responded to the small claims complaint with a motion to dismiss. The dismissal motion alleged that McMahon had sued the wrong party, that the title owner of the property was responsible. That person was the Debtor's mother, Pagona Christakis ("Pagona"), trustee of JCNP Realty Trust, which owned the extended property at 261–265 Boston Road in Billerica.[3] That property's tenants included both One Stop Financial, Inc. and the Cove Restaurant (the "Restaurant"), which Pagona owned and operated with the Debtor's occasional assistance. After a full hearing, the state district court judge was persuaded that the Debtor was liable on the McMahon claim, and, on December 18, 2000, granted McMahon judgment against the Debtor in the amount of $2,019.00, including costs. The Debtor's parting words to the district court judge were to the effect that the matter was not over. The small claims judgment required payment by January 19, 2001. No payment was made, and the state district court scheduled a contempt hearing for April 30, 2001.

The contempt hearing did not go forward. It was stayed by the filing of the instant Chapter 7 case, and the Debtor filed a Suggestion of Bankruptcy in the small claims action. However, McMahon, recalling that the Debtor had taken the position that Pagona, as trustee of the Trust—and not the Debtor—was liable for the electrical work done on the property, filed a motion with the district court requesting that the defendant's name be amended to JCNP Realty Trust ("Pagonas [sic] Christakis, Trustee"). McMahon had the motion served by constable upon the Debtor at his place of employment, but Pagona was not served.[4] Ultimately, the district court granted the relief requested by McMahon on June 11, 2001. The judgment was amended to include "Pagonas [sic], as trustee of the Trust." [5]

The Debtor took this new development poorly and filed the instant adversary proceeding, seeking relief under 11 U.S.C. § 362(h). The Debtor claims that McMahon's postpetition continuation of the small claims action, by which he presumably means McMahon moving to amend the judgment to include "Pagonas" [sic] as trustee/defendant and serving those papers on the Debtor, violated the automatic stay under § 362(a)(1). McMahon responded by making two points in his Answer and Request for Sanctions. First, he noted that he had no notice of the Chapter 7 filing during the relevant period, not having been served with the Suggestion of Bankruptcy [6] and not having been properly

---

3. At other times since, the Debtor has argued that the party liable is One Stop Financial, Inc. and/or Peter Giannakopoulos, more information about whom is supplied below.

4. The record is unclear as to whether the Lowell District Court somehow served Pagona directly.

5. McMahon had asked that Pagona be substituted for the Debtor; but the district court instead added Pagona as a party defendant. If that was an error, it is not material to the issues before this Court.

6. This point appears well made. The Certificate of Service accompanying the Suggestion of Bankruptcy notes service on McMahon's attorney. But that was not possible; McMa-

listed in the bankruptcy schedules. Second, he argued that his effort to amend the small claims action to substitute Pagona as the defendant did not constitute judicial action *against the Debtor.*

In response to McMahon's Answer, the Debtor remembered additional violations of the automatic stay. With leave of this Court, he amended his complaint in this adversary proceeding to add the following paragraphs:

11. On May 1, 2001, Defendant called Plaintiff's place of employment and asked for me. Plaintiff requested that a fellow worker take the call.

12. Defendant talked to a fellow employee of Plaintiff's [sic], Cindy Porter, and stated to Porter that Defendant wanted his money.

13. Defendant made other harassing telephone calls to other employees, in which he would defame me.

McMahon's amended Answer denied the additional allegations. However, the Debtor was determined to prove his new assertions and secured three separate statements in support of his version of events. First, he obtained an undated affidavit purportedly from Cindy Porter (the "Porter Affidavit"), a waitress at the restaurant. The Porter Affidavit recited:

On or after May 1, 2001, I Cindy Porter, swear that Gerald McMahon called the Cove Restaurant and asked for Nicholas Christakis, Nicholas instructed me to tell him that he was not present. Gerald McMahon continued to discuss the money owed to him stating that he wants to collect the money to myself, Cindy Porter. I, Cindy Porter proceeded a second after the phone call, telling him (Nicholas Christakis) that he (Gerald McMahon) wants his money.

The Porter Affidavit was allegedly notarized by Stephen Kenyon, a notary public.

Second, the Debtor secured an undated affidavit purportedly signed by Pagona (the "Pagona Affidavit"). It recited in language and style (and computer/typewriter type) unmistakably similar to the Porter Affidavit:

On or after May 1, 2001 I Pagona Christakis, swear that Gerald McMahon called the Cove Restaurant asking for Nicholas Christakis. I told him that he was not here, so he continued discussing with me the situation involving Nicholas Christakis. Gerald McMahon discussed the money owed to him stating that he wants to collect the money from Nicholas and that he is entitled to the money. I, Pagona Christakis informed (Nicholas Christakis) that he (Gerald McMahon) wants his money.

The Pagona Affidavit was also allegedly notarized by Stephen Kenyon.

Third, the Debtor secured a letter, dated November 5, 2001, from a Jamie Guerriero (the "Guerriero Letter") addressed to "Whom It May Concern" and stating:

I am writing to confirm that in late May, early June I received a telephone call from a gentleman who identified himself as Gerald McMahon. Mr. McMahon had called BLS Funding looking for Nicholas Christakis. I am the Vice President of Operations for the company, and from time to time field phone calls for Mr. Christakis. During this particular phone call, Mr. McMahon made it clear that he was looking for Nicholas Christakis, and was looking for him to "pay him what he owes." Mr. McMahon seemed angry during this telephone call and made mention that if Mr. Christakis did not "make good on what he owes," that he would "go after

hon was officially pro se, albeit with the assis-

tance of an attorney acquaintance.

his mother for it." This telephone conversation lasted approximately 5 minutes in length . . . .

I am certain that this call took place after 05/23/01, this was my start date with BLS Funding.

At trial of this adversary proceeding, the various witnesses (those who had presented statements and others) presented remarkably different and confusing versions of the facts supporting the foregoing statements. It was undisputed that McMahon had been retained to do electrical work for a new enterprise, formed by the Debtor and Peter Giannakopoulos, and that the new business was to be conducted in the same premises as was located the restaurant, 265 Boston Road, in Billerica. Mr. Giannakopoulos was the chef and manager of the restaurant and had been so for over 15 years. McMahon was a friend of Giannakopoulos, and Giannakopoulos retained McMahon to do the electrical work on the buildout required for the new enterprise. McMahon quoted Giannakopoulos $4,200 for the electrical work. Giannakopoulos agreed, and, at some point prior to completion, paid McMahon $2,100 in cash from his own funds, and promised to pay McMahon the balance at the end of the job. Mr. Giannakopoulos intended to be reimbursed by the new company when it had the ability to do so. There were also other advances, totaling over $10,000, made by Giannakopoulos to other contractors on account of this new enterprise.

At some point thereafter, the Debtor decided, unilaterally, to terminate his relationship with Giannakopoulos. When Giannakopoulos sought repayment of the monies advanced by him, Pagona reimbursed those funds to Giannakopoulos. However, the balance of the funds owed to McMahon had not yet been paid.

The facts attendant to the amendment of the small claims action to substitute/add Pagona as a party defendant produced few material issues of factual dispute. Not so with respect to the Debtor's allegations that McMahon made several postpetition telephone calls to collect his debt.

The Debtor claimed that McMahon called the restaurant in an attempt to speak to him about the disputed funds and spoke to Cindy Porter. The substance of the Debtor's allegation is contained in the Porter Affidavit above. The Debtor also claimed that McMahon called the restaurant at least one other time, looking for the Debtor to discuss the funds owed and spoke to Pagona. The substance of that alleged conversation is purportedly contained in the Pagona Affidavit. Finally, the Debtor claimed that McMahon called, looking for the Debtor at his employment at BLS Funding and spoke to Jamie Guerriero. The substance of that alleged conversation is purportedly contained in the Guerriero Letter.

At trial, McMahon conceded that he served the Debtor postpetition with the motion to amend the small claims action. However, he maintained that he had the right to do so, notwithstanding the automatic stay, because the amendment was directed against Pagona, as trustee, and not against the Debtor. Indeed, he reminded the Court that the Debtor himself had, in the small claims action, directed attention toward Pagona by moving to dismiss on the grounds that she, as trustee, was the proper party defendant. And although he had selected a constable for service on the Debtor of the motion to amend the complaint, McMahon testified that the choice was made because the Debtor had a history of deception that would have otherwise created an obstacle for proof of service. As for the alleged telephone calls to the restaurant, McMahon denied that he had ever called postpetition to seek a conversation with the

Debtor about the amounts owed to McMahon. Indeed, he had called frequently to talk to the chef/manager Giannakopoulos, a personal friend of long standing. One or more of those calls might have been first answered by Porter, whose waitress duties included answering telephones. However, he had never called looking for the Debtor.

Giannakopoulos' testimony was consistent with that of McMahon. He agreed that McMahon often called the restaurant to make arrangements for the two to go out together in the evening, but he testified that McMahon never called him with a view to collecting the debt allegedly owed by the Debtor.

While Pagona's testimony supported the Debtor's story, Cindy Porter's testimony did not. She had worked at the restaurant off and on for approximately 15 years. She testified that she had, indeed, received a telephone call from McMahon in which he asked her to relay a message that he wanted to be paid the balance of the monies owed by the Debtor. However, she testified that the telephone conversation had *predated* the Chapter 7 filing. Further she recounted a series of postpetition conversations she had with the Debtor and Pagona. In the first, the Debtor had called her over to a quiet area of the restaurant and asked that she testify that McMahon had asked her about the monies owed by the Debtor. When she declined to become involved, the Debtor had offered her $500 to do so. She refused. In the second, on a day in which she and Pagona were working alone, Pagona placed a legal-size handwritten paper in front of her and asked her to sign at the bottom. When Porter asked what it was about, Pagona

responded, "[S]ign it, it's not important, it's for Nick." Trial Transcript, p. 132. As instructed, Porter signed the paper. That document has mysteriously vanished. It was not produced during discovery. Instead, the Debtor has proffered only a copy of the Porter Affidavit; he claimed not to be able to find its original.

Moreover, there is an additional problem. When the Porter Affidavit was shown to Porter at her deposition in preparation for trial, Porter claimed never to have seen the typed affidavit. She testified that the signature was not her own. Indeed, the signature on the copy of the Porter Affidavit appears traced. It also begins with the words "On and after May 1, 2001," which is suspect since Porter was out of work from April 20 to June 19 of that year on account of surgery. When Porter returned to work on the day of her deposition, Pagona was noticeably cool and would not speak to her. That evening, Porter was called and informed that her work hours had been reduced and shifted to a less busy (and less lucrative) work schedule. Within days, she was laid off completely.[7]

Steven Kenyon, who allegedly notarized the Porter Affidavit, testified but was not particularly helpful. He worked at BLS Funding with or for the Debtor. Although he was personally acquainted with Cindy Porter, he could not remember her appearing before him as alleged in his notarization. However, he insisted that his signature was accurate, and that he had never notarized a document without the witness standing before him. Mr. Kenyon's inability to remember notarizing a document in the presence of Ms. Porter

7. Various witnesses testified that it was common practice at the restaurant to lay off waitresses during slow periods and rehire them when business picked up. The relevant period was slow, but the coincidence of this particular layoff cannot be ignored, and, although business for the restaurant subsequently improved, Porter was not recalled to work.

was credible. His contradictory testimony with respect to his practice of demanding the presence of signatories as a condition to his document notarization was not.

Jamie Guerero testified that he was employed by BLS Funding as Vice President of Operations. He claimed to have received two postpetition telephone calls from McMahon. The first was at BLS Funding. Someone (but Guerero could not be certain who, until claiming to be able to identify McMahon's voice in the courtroom now months after the relevant conversation) had called to speak to the Debtor and, mistaking Guerero for the Debtor, demanded payment in an angered tone. The caller threatened to obtain payment from the Debtor's mother if payment was not made by the Debtor. Guerero subsequently communicated the substance of the call to the Debtor. The second call was at Guerero's home. McMahon allegedly did not identify himself at first and indicated that he was calling to obtain Guerero's residential address for the purpose of serving him with a deposition subpoena. McMahon subsequently identified himself and indicated that he was calling Guerero at home because he believed Guerero no longer to be working at BLS Funding. Guerero testified that, later in that telephone conversation, McMahon threatened to pursue perjury charges against Guerero and anyone else who might lie under oath to the facts incident to this adversary proceeding.

The Debtor also testified. He claimed to have been humiliated by the constable's service upon him of the motion to amend the judgment in the small claims action. He insisted there had been more than one postpetition telephone call from McMahon to Porter relating to the debt owed to McMahon; he had witnessed one himself. He further maintained that McMahon had made efforts to persuade other contractors not to deal with the Debtor in the future. In the words of the Debtor:

> To be honest, candidly speaking, it's been a living hell. It's—you know, I can't sleep at night. I got to always watch over my back. My business is affected. My own employees are thinking I'm some shyster, local political officials calling me shysters. I've been nothing but embarrassed, humiliated. I can't even—I really can't even explain what I go through. Like you wouldn't believe me if I begun explaining to you . . . .
>
> Well, contractors not even—not even taking my jobs anymore because I've had—I had them harassed by the electrical—Mr. McMahon, saying, "Don't go, don't do it, I'll petition the state." Just the Town of Billerica—Antonelli, the head electrician, he must have filed like forty complaints, forty formal complaints. He even told me himself he's the one who called me a shyster. Called me a shyster. I don't even know what a shyster is, but he says, "You're a shyster." I go, "No, I'm not," and it's just one after the other. My own employees, after I'm being served, they're thinking I'm running some illegit corporation when I'm trying to make a living. My own mother being affected, can't sleeping at night, ran down to Peter now. Everybody being affected . . . .
>
> I probably deserve a million dollars, honestly, but literally, just—just my court case, my fees, and really not even what my time's worth, but ideally, $10,000 wouldn't even begin being what I'm worth, but I would—I would accept $10,000.

Trial Transcript, pp. 98–99.

This Court has had an opportunity to assess the Debtor's credibility. There was none. The Debtor sat in the courtroom, at counsel table next to his attorney, be-

mused throughout most of the trial. Only when he testified did his demeanor and words speak to his pain. And he was quick to translate that pain into dollars. This Court also found little or no credibility in the testimony of Pagona and Guerero. On the other hand, the Court believed the testimony of McMahon, and also found credible the words of Giannakopoulos and Porter.

Accordingly, this Court finds that, although McMahon had a constable serve the Debtor postpetition with a motion to amend the small claims complaint, there is no credible evidence that McMahon contacted any other person for the purpose of collecting the prepetition debt which the Debtor owed to him. Any postpetition telephone contacts by McMahon which actually did occur were incident only to his defense in this adversary proceeding and so limited. On the other hand, in the view of this Court, the Debtor: 1) testified untruthfully at the trial of this adversary proceeding; 2) attempted to purchase the testimony of Porter in preparation therefor; and 3) forged, or caused to be forged, Porter's signature to the Porter Affidavit.

## II. DISCUSSION

The Debtor claims that McMahon violated the automatic stay in two different ways. First, the Debtor argues that McMahon violated the stay by serving him with notice of the amendment of the small claims action to add (or substitute) his mother as a party defendant. Second, the Debtor contends that McMahon violated the stay by making various postpetition telephone calls in order to effect collection of the debt. The Court takes these in turn.

### A. *Notice of Amendment of the Small Claims Action*

As this Court noted recently:

From the moment of case commencement until terminated by operation of law or court order, the automatic stay under 11 U.S.C. § 362(a) of the Bankruptcy Code serves as a shield to protect the "fresh start" promised by Congress to the honest debtor and to ensure the right of similarly situated creditors to a uniform distribution of nonexempt assets. *Soares v. Brockton Credit Union (In re Soares),* 107 F.3d 969, 975 (1st Cir.1997). "The automatic stay is among the most basic of debtor protections under bankruptcy law." *Id.* at 975; *see also In re Steenstra,* 280 B.R. 560, 566 (Bankr.D.Mass.2002).

*In re Weber,* 283 B.R. 630, 633 (Bankr. D.Mass.2002).

Section 362(a)(1) specifically bars "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding *against the debtor* that was or could have been commenced before the commencement of the case under this title, or to recover a claim *against the debtor* that arose before the commencement of the case under [the Code] ...." 11 U.S.C. § 362(a)(1) (emphasis supplied). The statute is clear. The stay applies only to the debtor and not to co-defendants. *Austin v. Unarco Industries, Inc.,* 705 F.2d 1, 4 (1st Cir.1983) (holding that the protections of the automatic stay apply only to actions against the debtor), *cert. dismissed,* 463 U.S. 1247, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983); *Apollo Molded Products, Inc. v. Kleinman (In re Apollo Molded Products, Inc.),* 83 B.R. 189, 191 (Bankr.D.Mass.1988) (*ibid*).

Here, the Debtor does not specifically argue that the stay should apply to Pagona. Rather, he argues that he should not have been served with notice of the amendment to include her as a party de-

fendant. The Court finds no merit in that argument. Notwithstanding the reach of the automatic stay, debtors continue to have a responsibility to serve as witnesses in non-bankruptcy court litigation filed or continuing against non-debtor parties unless and until a bankruptcy court says otherwise. The automatic stay does not apply in those circumstances because the litigation is not *against the debtor*. By the same token, there is no per se violation of the stay in serving notice to the debtor of actions taking place in litigation to which the debtor was formerly an active party. In this case, the continuation of the small claims action was not against the Debtor; McMahon sought to amend the complaint to substitute Pagona. Service of process of the amendment was not an action designed to collect any money from the Debtor and, accordingly, the automatic stay is inapplicable.[8]

The Debtor goes further. He argues that McMahon's motion to amend the small claims judgment to substitute Pagona, as trustee, and service of the amendment upon the Debtor by a constable at his place of work were acts of harassment designed to collect the debt owed McMahon. The Court disagrees. While such acts in other circumstances might serve as pretext for the kind of harassment which would violate the automatic stay, they were reasonable in the context here. Amendment of the complaint to substitute Pagona, as trustee, may have been motivated by the Debtor's bankruptcy case filing, but the merit of doing so was suggested by the Debtor during the state court litigation. As for the service by constable, this too seems reasonable in context. This Court has heard the tape of the proceeding before the state court judge, admitted into evidence. The Debtor seemed no more credible there than here. At one point, he even denied knowing McMahon. Service by constable ensured the availability of a disinterested witness to testify as to the effectiveness of service upon a litigant with a poor history of truthfulness. A reasonable person could do no less. It was self-protection that informed McMahon's actions, not harassment.

## B. The Alleged Telephone Calls Attempting to Collect the Debt.

█ The telephone calls allegedly made by McMahon to collect the debt are easily dispatched. The Debtor bears the burden of persuasion as to each element to be proved under § 362(h). That burden was

---

8. The Court acknowledges a line of cases in which unusual circumstances have prompted extending the automatic stay to non-debtors with an "identity" of interest with the debtor. *See A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.)*, 788 F.2d 994, 999 (4th Cir.1986) (extending automatic stay protections to non-debtors where there is "such identity" between the debtor and a third party that judgment against the third party is tantamount to judgment against the debtor). Other courts have employed 11 U.S.C. § 105(a) to enjoin actions which seemed to inappropriately undermine or interfere with a debtor's reorganization. *See Stadium Mgmt. Corp. v. The Connecticut Bank and Trust Co., (In re Stadium Mgmt. Corp.)*, 95 B.R. 264, 266 (D.Mass.1988) (enjoining the sale of a non-debtor's property that was contiguous with the debtor's property because of a potentially adverse impact upon the debtor's reorganization). However, even in such cases, the debtor must initiate the request, asking the Court to extend the stay or issue an injunction. The debtor may not first seek a remedy for a violation of a stay which will be sought at the hearing on the alleged violation. Furthermore, in this case, the Debtor has no argument that there is any sort of "identity of interest" between him and Pagona, as trustee. It was the Debtor who asked the state court to dismiss the small claims complaint against him because Pagona, as trustee, was the responsible party. Having separated himself from Pagona on the state court level, he is judicially estopped from attempting to merge their interests at this time.

not met. Indeed, this Court believes that the Debtor (as well as Pagona and Guerero) testified falsely under oath. Nothing more need be said.

### C. McMahon's Request for Sanctions under Fed. R. Bankr.P. 9011

■ Finally, in his Answer to the amended complaint, McMahon requests that the Court award him sanctions under Fed.R.Civ.P. 11.[9] The Court cannot accommodate that request. McMahon has made no showing of compliance with the "safe harbor" provision of Fed. R. Bankr.P. 9011(c)(1). Nevertheless, the Court is entitled, in appropriate circumstances, to express its own disdain for the behavior of parties before it. In light of the Court's findings, *supra*, that the Debtor: 1) testified untruthfully at the trial of this adversary proceeding; 2) attempted to purchase the testimony of Porter in preparation therefor; and 3) forged, or caused to be forged, Porter's signature to the Porter Affidavit, the Court shall order the Debtor, pursuant to Fed. R. Bankr.P. 9011(c)(2) to show cause why he is not responsible for violations of Fed. R. Bankr.P. 9011(b)(1) and/or (3) through such conduct, and why he should not be sanctioned accordingly.

9. Actually, the applicable and analogous rule is Fed. R. Bankr.P. 9011, which provides in relevant part:

**(b) REPRESENTATIONS TO THE COURT.**
By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.
**(c) SANCTIONS.**
If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.
(1) How initiated.
(A) By motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 7004. The motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected, except that this limitation shall not apply if the conduct alleged is the filing of a petition in violation of subdivision (b). If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees.
(B) On court's initiative. On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto.

## III. CONCLUSION

Recently, this Court had occasion to recall the following metaphoric quote employed by the First Circuit in the case of *Soares v. Brockton Credit Union (In re Soares),* 107 F.3d 969, 971 (1st Cir.1997):

> "[T]he dead tree gives no shelter." *T.S. Eliot, The Waste Land, I, The Burial of the Dead* (1922). Like a shade tree, the automatic stay which attends the initiation of bankruptcy proceedings, 11 U.S.C. § 362(a) (1994), must be nurtured if it is to retain its vitality.

*In re Weber,* 283 B.R. 630, 635 (Bankr. D.Mass.2002).

Well, there are two ways to kill a perfectly good tree, short of cutting it down. One is to starve and pay it no attention. The other is to poison it with toxic substances. Section 362(a) is as much threatened by abusive as by neglectful behavior. Frivolous allegations of stay violation or, as dangerous, assertions of trivial technical violation made either for the purpose of revenge or profit, cheapen the importance of the automatic stay and its in terrorem value to all debtors and creditors involved in bankruptcy cases. The matter before this court provides good examples of both.

The Court GRANTS judgment for the Defendant McMahon. The Court DENIES McMahon's request for sanctions under Fed R. Civ. P. 11, but ORDERS the Debtor to SHOW CAUSE to the Court, pursuant to Fed. R. Bankr.P. 9011(c)(2), why the Debtor should not be found to be responsible for violations of Fed. R. Bankr.P. 9011(b)(1) and/or (3), and sanctioned accordingly.

A separate Order in conformity with this Memorandum of Decision shall enter in conjunction herewith.