**Nadeau v. SSA**                             CV-01-310-B    05/21/03

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE


**Bryan D. Nadeau**

   v.                                   Civil No. 01-310-B
                                         Opinion No. 2003 DNH 083
**Jo Anne Barnhart**



### MEMORANDUM AND ORDER

On March 16, 1999, Bryan Nadeau filed an application with the Social Security Administration ("SSA") for Title II disability insurance benefits ("DIB"). After his application was denied, both initially and on reconsideration, Barrett requested a hearing. Administrative law judge ("ALJ"), Robert S. Klingebier, held a hearing, and on November 15, 2000, determined that Nadeau was not disabled. Nadeau appealed, but on September 28, 2001, the Appeals Council denied his request for review.

Nadeau brings this action pursuant to 42 U.S.C. § 405(g) (1991 & Supp. 2002), seeking review of the denial of his application for DIB. Nadeau argues that the finding that his

subjective reports of pain and disability lacked credibility is unsupported by substantial evidence.

## I. BACKGROUND

### A. Work History

Nadeau was forty years old when he filed his application for DIB. He is a high school graduate and took a number of college courses, but he did not earn a college degree. Nadeau's work experience includes owning and operating a plumbing and heating business, working as a certified nurse's assistant, working in the computer aided design field, and managing service oriented businesses. He closed his plumbing and heating business in 1999, when he contends he became disabled and could no longer work. Since then, Nadeau has not worked, relying upon friends, family, and unemployment benefits for support.

### B. Medical History

Nadeau claims that he has had pain in his joints since he was at least fourteen. He claims that he was in an automobile accident at age twelve, and that soon thereafter he began to suffer from pain in his joints. Nadeau's treatment for this

pain, according to the administrative record, began in 1998.[1]

In February 1998, Nadeau told his primary care physician, Dr. Gary Shapiro, that he had pain in his knees, shoulders, and back. Dr. Shapiro referred him to Dr. John Schlegelmilch for a rheumatology consultation. Dr. Schlegelmilch conducted an examination of Nadeau on March 11, 1998. Nadeau's joint examination was negative. However, given Nadeau's self-reported history of musculoskeletal symptoms of unclear etiology, Dr. Schlegelmilch opined that he may have a sero-negative spondyloarthropathy.[2] Dr. Schlegelmilch ruled out fibromyalgia. Nadeau was prescribed Prednisone.[3]

On a follow-up examination by Dr. Schlegelmilch, Nadeau reported an excellent response to the Prednisone, noting an increase in energy and a reduction in stiffness and pain.

---

[1] Nadeau also complained of asthma and depression during the course of his treatment with various doctors. Because the focus of Nadeau's claim involves his complaints of chronic joint pain, I do not include a detailed explanation of Nadeau's asthma and depression in this background section.

[2] Spondyloarthropathy is a disease of the joints of the spine. Dorland's Illustrated Medical Dictionary (Dorland's) 1563 (28th ed. 1994).

[3] Prednisone is a steroid used for its anti-inflammatory properties. Dorland's at 1346.

However, Nadeau returned to Dr. Schlegelmilch in August 1998 and complained of trouble working and difficulty making a fist because of joint swelling. After a reduced Prednisone dose increased Nadeau's arthritic symptoms, Dr. Schlegelmilch prescribed an aggressive treatment plan in order to allow Nadeau to continue working. Dr. Schlegelmilch also prescribed Methotrexate.[4]

Nadeau's condition improved with the aggressive Prednisone treatment. However, in January 1999, he complained to Dr. Schlegelmilch of joint pain and stiffness. Dr. Schlegelmilch examined Nadeau and found no joint swelling, but based upon his symptoms and presentation Dr. Schegelmilch diagnosed him with inflammatory arthritis. Nadeau continued to complain of pain in his joints and back during the months following the January examination, despite further aggressive Prednisone treatment. Dr. Shlegelmilch noted that Nadeau's problems were a "mystery" and "all-in-all very confusing." Dr. Schlegelmilch did note that stress and depression may be a factor involved in Nadeau's joint

---

[4] Methotrexate is used, <u>inter alia</u>, in the treatment of adult rheumatoid arthritis and psoriatic arthritis. <u>Dorland's</u> at 1029.

pain.  He prescribed hydroxychloroquine[5] for Nadeau's joint inflammation and Paxil for his depression.

Dr. Shapiro saw Nadeau on May 6, 1999.  Nadeau reported that he continued to experience pain in his lower back, hands, knees, feet and toes.  Dr. Shapiro noted that he "appear[ed] well," but he had some tenderness in his lower back.  Nadeau could bend easily, but he could not touch his toes.  There was no focal tenderness in his knees and no ligament instability.  Dr. Shapiro remarked that Nadeau's medical history and examinations were "confusing," yet they "seem[ed] most compatible with a fibromyalgia-type picture, rather than an inflammatory arthritis."

On May 12, 1999, Nadeau saw Linda J. Groiss, PA-C.  Nadeau stated that his job as a plumber and heating contractor required him to frequently squat and kneel.  This, according to Nadeau, aggravated his knees.  Groiss's examination revealed that Nadeau had suffered from Osgood-Schlatter[6] disease as a child, but that

---

[5] Hydroxychloroquine is an anti-inflammatory frequently used in the treatment of arthritis.  Dorland's at 787.

[6] Osgood-Schlatter's disease is a degeneration and later recalcification of the tibia.  Dorland's at 487.  It occurs most commonly in boys ages 10 to 15.  The Merck Manual 2414 (17th ed.

presently he had a full range of motion and no grinding or rubbing of the bones. Groiss noted that x-rays of his knees looked "great" and that the patellae were lined up "nicely" in the femoral groove. Groiss concluded that Nadeau had bilateral patellofemoral pain with a history of joint pain and athritic-type problems. She referred him to a quad strengthening program and fitted him with an elastic knee support.

Nadeau returned to Dr. Schlegelmilch on June 14, 1999, complaining that he could not work because of joint pain. After examination, Dr. Schlegelmilch again concluded that there was no evidence of joint swelling. He diagnosed Nadeau as suffering from fibromyalgia with an element of depression. Dr. H. Roger Hansen also evaluated Nadeau on June 14, 1999 for his complaints of knee pain. Although some tenderness was noted by Dr. Hansen, x-rays of Nadeau's knees were unremarkable and a magnetic resonance imaging scan ("MRI") was essentially normal. Dr. Hansen concluded that Nadeau had patellofemoral pain syndrome,[7] and nothing more serious. He suggested that Nadeau continue with

---

1999).

[7] Pain in the knee and femur.

a conservative treatment.

On August 11, 1999, Dr. Nancy Johnson evaluated Nadeau's reports of chronic pain. She did not diagnose Nadeau with fibromyalgia because there were no active trigger points and no evidence of joint redness, warmth or swelling. Rather, she concluded that he had an unknown type of inflammatory arthritis. Her examination revealed no outward thickening of the joints, and no warmth or redness of the joints. She recommended a trial therapy of hot wax treatments, which Nadeau later reported were unhelpful, and shoe orthotics. At a follow-up examination in September 1999, Nadeau reported that his foot pain had subsided with the use of the orthotics.

Nadeau saw Dr. William Swinburne for a consultative mental evaluation. Nadeau told Dr. Swinburne that his day was defined and controlled by his chronic pain. Dr. Swinburne's examination concluded that Nadeau suffered from "major depression, recurrent, moderate." Dr. Swinburne noted that Nadeau's difficulty in functioning at a job appeared more physical than psychological. However, Dr. Thomas Stearns, who examined Nadeau in September 1999, concluded that psychological factors contributed to Nadeau's complaints of pain. Dr. Stearns observed that Nadeau

was verbal and cooperative, although he sensed that Nadeau was somewhat guarded.  Pain behaviors were not notable.  Dr. Stearns diagnosed Nadeau with dysthymic disorder.[8]  Nadeau was to undergo a series of psychological inventories related to his pain and depression, however, the record is devoid of any evidence that such inventories were completed.

Nadeau returned to Dr. Stearns a year later.  Dr. Stearns noted that a number of medications had been tried and discontinued in an effort to abate Nadeau's pain.  Nadeau reported that his pain was mitigated by pacing his daily activities, including basic housework, visiting his parents, running errands, and taking warm baths.  He reported that he had come to accept the presence of pain and that his stress level had decreased.  Dr. Stearns remarked that Nadeau had applied constructive pain management strategies in an effort to engage in daily activities.  Dr. Stearns suggested that Nadeau enroll in a stress management group and mindfulness meditation program.

---

[8]  Dysthymic disorder is depression marked by episodes of major depression.  It begins in childhood or adolescence and continues along a low-grade course over many years or decades. Merck Manual at 1538.

In February 2000, Dr. Shapiro conducted a general physical examination on Nadeau and reported no swelling in the extremities and good peripheral pulsations.  Dr. Shapiro diagnosed Nadeau with chronic arthralgias.[9]

## C. Residual Functional Capacity Assessments

In June 1999, Dr. Burton Nault, a state agency physician, completed a residual functional capacity (RFC) assessment.  The RFC concluded that Nadeau could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for about six hours with normal breaks given an eight hour workday, sit for about six hours in an eight hour workday, and push and/or pull with the upper and lower extremities without restriction. Furthermore, the RFC concluded that Nadeau could occasionally climb, balance, stoop, kneel, crouch and crawl.  Nadeau was not found to be subject to any manipulative, visual, communicative or environmental limitations.  Dr. Nault noted that no treating or evaluating physician identified a total disability on a physical basis.

---

[9] Arthralgia is pain in the joints.  Dorland's at 140.

A second RFC was conducted by a state agency physician[10] in January 2000.  The results of this RFC were substantially similar to Dr. Nault's RFC completed in 1999.  The January 2000 RFC specifically noted Nadeau's subjective complaints of pain, but concluded that the results of the RFC were reasonable given the medical evidence.  However, the RFC did note that Nadeau should avoid concentrated exposure to extreme cold, fumes, odors, dusts, and gases.

D.    **Psychiatric Review Technique Forms**

Dr. Michael A. Schneider completed a psychiatric review technique form (PRTF) and rendered a mental residual functional capacity assessment in August 1999.  Based upon Dr. Swinburne's consultative report, Dr. Schneider concluded that Nadeau suffered from recurrent major depression.  He noted that Nadeau exhibited some signs of social isolation and depressed mood, as well as a decrease in motivation and capacity.  However, he concluded that Nadeau could perform tasks without supervision and was able to complete scheduled activities within a normal work week.  He also noted that Nadeau could perform normally in a low-stress setting.

_____

[10]  The physician's name is undecipherable from the record.

-10-

Dr. Carol McKenna completed a PRTF in December 1999. Based upon a review of the medical record, she also concluded that Nadeau suffered from depression. The only limitation she noted was Nadeau's moderate limitation in his ability to interact with co-workers.

### E.    The ALJ's Decision

In his November 15, 2000 decision, the ALJ applied the five-step sequential evaluation process under which disability applications are reviewed. See 20 C.F.R. § 404.1520. In the first step, the ALJ found that Nadeau had not engaged in substantial gainful activity since his alleged date of onset of disability. At the second step, the ALJ found that Nadeau's asthma, chronic complaints of pain, and depression constituted severe impairments. At the third step, he found that Nadeau's impairments, although severe, did not meet or equal the criteria of any listed impairment described in 20 C.F.R. § 404, Subpart P, Appendix 1.

In assessing Nadeau's RFC, the ALJ found that, prior to his date last insured, Nadeau could lift and carry more than twenty pounds occasionally or more than ten pounds frequently. But, the ALJ found that Nadeau should avoid exposure to dust and fumes,

and should avoid waiting upon the public. Based on this RFC, the ALJ found at step four of the disability evaluation process that Nadeau could return to his former employment, as it did not require the performance of work-related activities precluded by his limitations. Because the plaintiff was able to return to his past relevant work, he was not under a disability (as defined by the Act) prior to his date last insured.

In reaching this conclusion, the ALJ noted that Nadeau reported knee and joint pain, but that the reports of Dr. Schlegelmilch indicated that Nadeau had a normal evaluation and that his MRI testing was negative. Furthermore, Dr. Swinborne concluded that Nadeau had a normal posture and gait. The ALJ also pointed out that Nadeau reported to Dr. Shapiro that after he sold his business he was spending more time with his family. During a pain management consultation with Dr. Stearns in September 2000, Nadeau told the doctor that he suffered from pain but was able to spend time doing housework, running errands, and visiting with friends and family. The ALJ indicated that the medical records note that Nadeau's x-rays, MRIs, and joint function were consistently normal, and that Nadeau was fully weight bearing.

-12-

Finally, the ALJ also found that Nadeau's allegations of a disabling pain and other subjective symptoms were not entirely credible. Since Nadeau's alleged onset of disability, the ALJ noted that Nadeau acknowledged improvement in his symptoms after resolving his financial troubles. He found that Nadeau did not require strong pain medication to control his reported symptoms, and that Nadeau remained "quite active." Relying upon the medical record and the RFCs, the ALJ concluded that while Nadeau did experience some limitations as a result of his impairments (i.e., lifting more than 20 pounds occasionally and more than 10 pounds frequently; avoiding fumes and dust; avoiding waiting upon the public), he did not experience pain or other subjective symptoms at a level that would interfere with him performing his past relevant work.

## II.  <u>STANDARD OF REVIEW</u>

After a final determination by the Commissioner denying a claimant's application for benefits and upon a timely request by the claimant, I am authorized to review the pleadings submitted by the parties and the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the

Commissioner's decision.  See 42 U.S.C. § 405(g).  The court's review is limited in scope, however, as the Commissioner's factual findings are conclusive only if they are supported by substantial evidence.  See id.; Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  The Commissioner is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence.  See Irlanda Ortiz, 955 F.2d at 769; Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); see also Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 535 (1st Cir. 1988) ("[W]e must uphold the [C]ommissioner's conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.") (citations omitted).  Therefore, the court must "'uphold the [Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion.'"  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

While the ALJ's findings of fact are conclusive when supported by substantial evidence, they "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Charter, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (citations omitted). If the Commissioner has misapplied the law or has failed to provide a fair hearing, however, deference to the Commissioner's decision is not appropriate, and remand for further development of the record may be necessary. See Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 644 (2d Cir. 1983); see also Slessinger v. Sec'y of Health & Human Servs., 835 F.2d 937, 939 (1st Cir. 1987) ("The [Commissioner's] conclusions of law are reviewable by this court.") I apply these standards in reviewing the issues Barrett raises on appeal.

### III. __ANALYSIS__

Nadeau argues that the ALJ failed to follow SSR 96-7p when assessing his credibility. Specifically, he complains that the ALJ failed to consider the record as a whole and failed to consider the factors outlined in SSR 96-7p in determining that Nadeau was not fully credible. I disagree.

SSA regulations require that the ALJ consider a claimant's symptoms, including complaints of pain, when he or she is determining whether a claimant is disabled. See 20 C.F.R. § 404.1529(a). When determining whether a claimant's subjective statements are credible, an ALJ must evaluate the medical signs and laboratory findings, any diagnosis, prognosis or other medical opinions, and any statements/reports from the plaintiff or treating or examining physicians or psychologists about the patient's medical history. SSR 96-7p. In addition, because an individual's pain can sometimes result in a greater severity of impairment than can be shown by the objective medical evidence, the adjudicator must consider the following evidence, known as "the Avery factors," when assessing the credibility of an individual's statements: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any pain medication; (5) treatment other than pain medication; (6) any other measures that the claimant has used to relieve pain; and (7) other factors concerning the claimant's limitations and restrictions due to pain or other symptoms. See 20 C.F.R. §

416.929(c)(3); SSR 96-7p; Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 22-23 (1st Cir. 1986). In addition to these factors, the ALJ is entitled to observe the claimant, evaluate his demeanor, and consider how the claimant's testimony fits with the rest of the evidence. See Frustaglia, 829 F.2d at 195.

An ALJ's credibility determination must include specific findings and be based on a substantially accurate view of the record evidence. See Da Rosa v. Sec'y of Health and Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam) (ALJ's finding that a claimant is not credible "must be supported by substantial evidence" and must be based on "specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]."). Moreover, the ALJ's findings with respect to credibility "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. When properly supported by record evidence, the ALJ's credibility determination is entitled to substantial deference from this court. See Frustaglia, 829 F.2d at 195.

-17-

The record reflects that the ALJ considered the entire record and took into account the Avery factors.  He considered Nadeau's daily activities, noting that Nadeau reported to Dr. Stearns that he performs basic housework, visits his parents and friends, and runs errands.  Furthermore, the ALJ considered the duration, frequency, and intensity of Nadeau's pain, noting that since Nadeau's alleged onset of disability he acknowledged improvement in his symptoms.  The ALJ also noted that Nadeau's x-rays, MRIs, and joint function were consistently normal, and that Nadeau was fully weight bearing.

The ALJ also considered Nadeau's use of pain medication, stating that Nadeau did not require strong doses to control his alleged intense and chronic pain.  The absence of the need to use, or the actual use of, stronger pain medications is inconsistent with the severity of the pain Nadeau alleged.  See Albors v. Sec'y of Health and Human Servs., 817 F.2d 146, 147 (1st Cir. 1986) (per curiam) ("[The medical evidence], together with the fact that claimant apparently takes nothing stronger than aspirin, supports the ALJ's rejection of claimant's assertions of disabling pain."); Boisvert v. Callahan, 997 F.

Supp. 183, 186 (D. Mass. 1998) ("[The ALJ] found that the plaintiff could not reasonably suffer the degree of pain that she alleged without seeking more active treatment or taking pain medication stronger than Tylenol.").

Finally, the ALJ considered the fact that Nadeau's activities and physical capabilities are limited to some degree. Indeed, he specifically found that Nadeau could lift no more than 20 pounds occasionally and 10 pounds frequently. The ALJ also found that Nadeau should avoid excessive dust and fumes, and should not wait upon the public. However, he ultimately concluded that his RFC indicated he would have been able to perform his past relevant work activity. The medical evidence in the record supports the ALJ's determination that Nadeau's pain did not limit his functional capacity beyond that already assessed.

The ALJ's decision that Nadeau's complaints of pain were not fully credible is supported by substantial evidence. See Frustaglia, 829 F.2d at 195. (finding that more express findings would be preferable, but examination of the record demonstrated that substantial evidence supported the ALJ's findings).

## IV. <u>CONCLUSION</u>

Pursuant to sentence four of 42 U.S.C. § 405(g), I deny the plaintiff's motion for an order reversing the decision of the Commissioner (Doc. No. 8), and grant the defendant's motion for an order affirming the decision of the Commissioner (Doc. No. 9). The Clerk of Court is directed to enter judgement in accordance with this order and close the case.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

May 21, 2003

cc: Gerald D. Neiman, Esq.
    David L. Broderick, Esq.