**Lindahl v. SSA**                    **CV-02-400-B**    **08/21/03**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>Scott C. Lindahl</u>

    v.                          Civil No. 02-400-B
                                 Opinion No. 2003 DNH 143
<u>Jo Anne Barnhart,</u>
<u>Commissioner, Social Security Administration</u>


<u>MEMORANDUM AND ORDER</u>

Scott Lindahl first applied for disability insurance benefits ("DIB") and Supplemental Security Income in November 1995.  His applications were denied.  He refiled a new application for DIB in November 1999, alleging a disability since October 1996.  After this application was denied initially and upon reconsideration, Lindahl requested a hearing before an administrative law judge ("ALJ").  ALJ Robert S. Klingebiel presided over a hearing held March 15, 2001 and, on June 26, 2001, issued a decision denying Lindahl's application.

Pursuant to 42 U.S.C. § 405(g) (1991 & Supp. 2002 ), Lindahl seeks judicial review of the Commissioner of the Social Security Administration's ("SSA") decision denying his 1999 application.  Lindahl moves to reverse Commissioner's decision arguing that it

is not supported by substantial evidence in the record. (Doc. No. 9). Specifically, Lindahl contends that the ALJ erred by: (1) declining to hear corroborating testimony from Lindahl's ex-wife; and (2) indicating that he would consider a consultative examination paid for by the government if he could not find in Lindahl's favor. Lindahl also makes a general, unspecified challenge that the medical evidence clearly justifies finding Lindahl disabled. The Commissioner moves to affirm the decision. (Doc. No. 11).

## I. BACKGROUND

### A. Education and Work History

At the time of the hearing before the ALJ, Lindahl was 45 years old. Lindahl received a General Educational Development diploma ("GED") which is a high school equivalency certificate awarded after passing an examination. Prior to 1995, Lindahl worked primarily as an auto body repairman. After 1995, Lindahl worked in varying capacities, but he did not work continuously for any significant amount of time.

**B.    Medical Evidence**

By means of an overview, Lindahl's medical problems consist of: pain related to fibromyalgia; mild sleep apnea; fatigue; depression; diminished mental capacity; and a personality disorder.  He also has a history of drug abuse and recurrent alcoholism, but has been sober since 1997.

In 1995, Lindahl complained of pain in his side and constant fatigue.  Lindahl underwent a sleep study which indicated he suffered from sleep apnea.  In May 1995, James Bartels, M.D., indicated that Lindahl suffered from obstructive sleep apnea.[1]  Dr. Bartels noted that CPAP[2] or surgical treatment may alleviate the effects of obstructive sleep apnea.

Lindahl visited psychiatrist Paul Harris, Ph.D, for a psychological evaluation in May 1996.  Lindahl informed Dr. Harris that he was unemployed and did not feel that he was

---

[1] Obstructive Apnea- a sleep apnea resulting from collapse or obstruction of the airway with the inhibition of muscle tone that occurs during REM sleep.  Dorland Illustrated Medical Dictionary, ("Dorlands") page 106 (28th ed. 1994).

[2] CPAP is an abbreviation for "continuous positive airway pressure," a non-surgical treatment for sleep apnea that requires a patient to wear a special mask that regulates air pressure in the nose and throat as he or she sleeps.

capable of work because of his fatigue and memory problems. Dr. Harris recommended further neurological testing, but indicated that if permanent neurological damage is ruled out, Lindahl is likely capable of "average level work." (Transcript at 170) (hereinafter "Tr.").

In November 1996, Bennett Slotnick, Ph.D., conducted a neuropsychological evaluation as recommended by Dr. Harris. Dr. Slotnick noted that Lindahl's IQ placed him in the upper portion of the low average range of intellectual ability; however, Lindahl fell in the low average range in social judgment. Dr. Slotnick opined that his fatigue was "the primary culprit responsible for his [attention] difficulty." (Tr. 214). Dr. Slotnick concluded that there was "no evidence of neurodevelopmental learning disability" and therefore opined that a diagnosis of attention deficit disorder was inappropriate. (Tr. 218). In addition, Dr. Slotnick found that given his fatigue level and pain complaints, Lindahl did not appear to be a candidate for resuming regular employment; however, "should he desire to. . . resume regular employment, work in the area of auto body would seem the most appropriate." (Tr. 219).

In early December 1996, Lindahl visited Lorenzo Gallon,

M.D., complaining of headaches, joint pain, fatigue and also suicidal ideation. Lindahl informed Dr. Gallon that he did not try to kill himself, but he has been hallucinating. Dr. Gallon prescribed medication for his pain and indicated that Lindahl should visit a psychiatrist. A month later, Dr. Gallon examined Lindahl after a "negative work-up for chronic fatigue." (Tr. 186). Dr. Gallon prescribed Zoloft and Trazadone, both antidepressants and opined that his fatigue may be due to depression. Dr. Gallon also indicated that Lindahl should avoid work that involved neck strain because X-rays indicated degenerative disc disease at C5-6.

Over a year later, in April 1997, Lindahl underwent a trial of CPAP therapy for his sleep disorder. David P. White, M.D., conducted the trial and noted that while Lindahl had some trouble adjusting the CPAP mask, CPAP therapy permitted Lindahl to sleep properly. Dr. White indicated that Lindahl should utilize this therapy as it is helpful for his "mild sleep apnea," but that if Lindahl found CPAP intolerable, Lindahl could try other therapies. That same month, Lindahl underwent yet another psychiatric evaluation. Lindahl indicated that he recently began a part-time job. Dr. Potenza conducted the evaluation and

-5-

noted that "a diagnosis could not be determined due to the fact that [Lindahl] is a poor historian and somewhat withholding." (Tr. 225).

A month later, in May 1997, Lindahl complained of neck, shoulder and back pain, numbness and tingling. Patricia Daigneault, M.D., noted that Lindahl was a walk-in requesting percocet. After examining Lindahl, Dr. Daigneault found a normal range of motion and strength. She prescribed motrin and informed Lindahl to discontinue his use of naprosyn, an anti-inflammatory. Also in May 1997, Lindahl went on a week-long alcohol binge resulting in a DWI conviction, his second. Lindahl canceled various medical appointments due to his incarceration for his DWI offense.

Lindahl returned to Dr. Gallon in September 1997. He informed Dr. Gallon that he could not tolerate his CPAP therapy for his sleep apnea and, as a result, he was exhausted. He also complained of chronic joint pain, but upon examination, Dr. Gallon found his joints normal. Dr. Gallon indicated that he would look into whether surgery was appropriate for his sleep apnea, but ultimately decided that further exploration into CPAP therapy was warranted.

In October 1997, Lindahl visited Dr. Turnbull, a psychiatrist with The Mental Health Center of Greater Manchester. Lindahl complained that his memory was poor and that he was depressed. Lindahl indicated that he was doing "better," but not "great" on Zoloft. (Tr. 238). Dr. Turnbull prescribed Prozac and discussed its potential side effects. A month later when Lindahl revisited the Center, Dr. Turnbull noted that Lindahl appeared tired and depressed. Dr. Turnbull explained that the benefits of Prozac appeared to have waned and instead prescribed Serzone, indicated for depression. In December 1997, Lindahl explained to Dr. Turnbull that he believed his concentration difficulties as well as his depression were the result of sleep apnea.

A few months later, in February 1998, Lindahl was referred to a job counselor and indicated that he would like to get training in electrical assembly and repair work. Lindahl never showed up for his appointments with his job counselor.

In June 1998, after another failed attempt to adjust to CPAP therapy, Lindahl underwent surgery to correct airway obstructions that caused his sleep apnea. Lindahl indicated that he breathed easier after surgery, but that he was not sleeping well and his

motivation to find work decreased. In July 1998, Lindahl met with Dr. Potenza, who noted that Lindahl showed no signs of memory or concentration problems and despite being fatigued, Lindahl felt "quite good." (Tr. 272). In August, Lindahl decided to stop taking anti-depressants because he disliked their side effects. At that time, Dr. Potenza found Lindahl's mood to be good and his mental status to be normal. Throughout the fall of 1998, however, Lindahl complained of concentration problems and fatigue.

In March 1999, Lindahl visited Dr. John Yost at the Hitchcock Clinic. Lindahl complained, once again, of fatigue. In May, Dr. Yost noted that Lindahl's fatigue had "no defined etiology" and that he did not seem to meet any recognized criteria for chronic fatigue syndrome or fibromyalgia. (Tr. 290). Dr. Yost noted that Lindahl did not appear particularly depressed.

At the referral of Dr. Yost, Lindahl visited Dr. Margaret Caudill-Slosberg in June 1999. Dr. Caudill-Slosberg corroborated that Lindahl did not have the trigger points for fibromyalgia. She further opined that Lindahl was in good shape and reiterated that his neuropsychological evaluation did not show any

indication of a learning disability despite Lindahl's complaints of memory problems. Dr. Caudill-Slosberg asked Lindahl to keep a symptom diary, but Lindahl did not do so. In addition, Lindahl resisted any type of anti-depressant, but he indicated that he was sleeping six to eight hours a night and was not having mood problems. Furthermore, Dr. Caudill-Slosberg noted that despite complaining of joint pain all over, he rode his bicycle on a daily basis. Dr. Caudill-Slosberg also stated that Lindahl did not show up for the pain management program she recommended.

Lindahl indicated the same complaints in his August 1999 appointment with Dr. Caudill-Slosberg. Dr. Caudill-Slosberg noted that Lindahl was having a hard time distinguishing his symptoms and displayed little in the way of pain. She further noted that Lindahl's mood was appropriate. Lindahl informed Dr. Caudill-Slosberg that he dropped out of the pain management program, but wanted a prescription for pain medication so he could take it "as needed." (Tr. 297).

In September 1999, Lindahl visited Dr. Brian Binczewski and requested pain medication for "acute flares." (Tr. 299). Dr. Binczewski recommended participation in a pain management program, but Lindahl declined stating "he had learned to live

with the pain for the most part." (Id.). Lindahl stated he only needed medication once every one or two weeks.

In March 2000, Dr. Robert Mullaly completed a psychological evaluation for Lindahl. The results of the evaluation were normal and Lindahl showed no sign of significant memory or concentration problems, or any sign of attention deficient disorder. Dr. Mullaly opined that Lindahl had a personality disorder, but did not believe Lindahl had any significant functional limitations due to his personality disorder.

C. **SSA Ordered Medical Opinions**

In January 2000, Dr. Hugh Fairley, a state physician, reviewed Lindahl's medical record and completed a residual functional capacity form. (Tr. 305-314). Dr. Fairley determined that his surgery was successful, but that there were "still some residuals from the sleep apnea." (Tr. 312). He indicated that Lindahl was in good physical shape and never met the requirements of establishing a diagnosis for chronic fatigue or fibromyalgia. He further discussed that Lindahl was uncooperative in his treatments for depression and pain management. Dr. Fairley ultimately found Lindahl capable of performing a full range of medium work.

-10-

A state psychologist, Dr. Craig Stenslie, examined Lindahl in April 2000. After reviewing Lindahl's medical record, he concluded that Lindahl has no significant limitations of basic mental functioning. Dr. Stenslie relied on Dr. Mullaly's finding that Lindahl has a personality disorder, but did not have functional limitations as a result. In addition, Dr. Stenslie opined that Lindahl's allegations of concentration, stress management, and attention difficulties were not credible. To the extent Lindahl did have actually have these difficulties, Dr. Stenslie opined that they were episodic and not severe.

## D.  **Hearing before ALJ**

ALJ Klingebiel presided over a hearing on March 15, 2001, in which he heard testimony concerning Lindahl's prior unfavorable decision on his 1999 application for DIB. Lindahl testified that he was unable to work for more than just a few weeks at a time because he was "limited in what [he] can do physically. . . [he has] trouble seeing things the way that other people see them. . . and also [he] has a very bad memory." (Tr. 25). He stated that on an average day, he would take one to three naps, make something to eat and attend an Alcoholics Anonymous ("AA") meeting. After the AA meetings, Lindahl stated he would return

-11-

home and do some housework, such as picking up or doing the dishes.  Lindahl's attorney also testified that his treating physician, who he identified as Dr. Richmand, refused to complete a treating physician medical form for purposes of the hearing. He further noted that Dr. Richmand has not examined Lindahl since 1999.  The ALJ noted that Lindahl underwent a consultative psychological examination ordered by the SSA, but did not have an SSA ordered physical evaluation.  The ALJ stated that if, after reviewing the record, he determined a physical evaluation was necessary, he would so order.

Lindahl's ex-wife, Debbie, was willing to testify. Lindahl's counsel stated that Lindahl currently lives with Debbie and that she was present to corroborate his claims of fatigue. After hearing what Debbie purported to add, the ALJ stipulated that Debbie would corroborate what Lindahl testified to in regard to his symptoms.

## E.   **ALJ's Findings**

The ALJ applied the five-step sequential evaluation process

under which DIB applications are reviewed.[3]  He found that Lindahl carried his burden through step four.  The ALJ did not, however, find Lindahl's testimony credible based on objective medical evidence.  Specifically, the ALJ noted physicians who examined him did not find Lindahl had either fibromyalgia or chronic fatigue syndrome.  In addition, the ALJ found that Lindahl's treatment history was sparse and that he refused additional treatment for pain management.  The ALJ also found that although Lindahl complained of sleep difficulties, studies revealed only a mild disorder.  Lastly, the ALJ noted that Lindahl's complaints of depression were not supported by the record and "there has been minimal treatment for [the] alleged symptoms." (Tr. 14).

At step five, the ALJ found that Lindahl retained the residual functional capacity for medium work.  He thus determined

---

[3] The five-step evaluation process requires the ALJ adhere to the following sequential analysis: (1) whether the claimant is performing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from performing past relevant work; and (5) whether the claimant is capable of performing any work that exists in significant numbers in the national economy.  See 20 C.F.R. § 404.1520.

that Lindahl was not capable of performing his past work as an auto body worker because auto body work is categorized as heavy work. The ALJ then applied the Medical-Vocational Guidelines (the "Grid"), and the Grid directed him to find Lindahl not disabled under the Act.

## II. **STANDARD OF REVIEW**

After a final determination by the Commissioner denying a claimant's application for benefits and upon a timely request by the claimant, this court is authorized to review the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the Commissioner's decision. See 42 U.S.C. § 405(g). The court's review is limited in scope, however, and the Commissioner's factual findings are conclusive only if they are supported by substantial evidence. See id.; Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). The Commissioner is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence. See Irlanda Ortiz, 955 F.2d at 769; Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); see also Tsarelka v. Sec'y of

Health & Human Servs., 842 F.2d 529, 535 (1st Cir. 1988).
Therefore, the court must "'uphold the [Commissioner's] findings
. . . if a reasonable mind, reviewing the evidence in the record
as a whole, could accept it as adequate to support [the
Commissioner's] conclusion.'" Irlanda Ortiz, 955 F.2d at 769
(quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d
218, 222 (1st Cir. 1981)).

While the ALJ's findings of fact are conclusive when
supported by substantial evidence, they "are not conclusive when
derived by ignoring evidence, misapplying the law, or judging
matters entrusted to experts." Nguyen v. Charter, 172 F.3d 31,
35 (1st Cir. 1999) (per curiam) (citations omitted). If the
Commissioner has misapplied the law or has failed to provide a
fair hearing, deference to the Commissioner's decision is not
appropriate, and remand for further development of the record may
be necessary. See Carroll v. Sec'y of Health & Human Servs., 705
F.2d 638, 644 (2d Cir. 1983); see also Slessinger v. Sec'y of
Health & Human Servs., 835 F.2d 937, 939 (1st Cir. 1987) ("The
[Commissioner's] conclusions of law are reviewable by this
court.") I apply these standards in reviewing the issues Lindahl
raises on appeal.

-15-

## III. **ANALYSIS**

Lindahl challenges the Commissioner's decision for two reasons: (1) the ALJ denied Lindahl a full opportunity to present his case by declining to hear testimony from Lindahl's ex-wife and stipulating that it would corroborate what Lindahl testified to, yet subsequently finding Lindahl's testimony not credible; (2) the ALJ erred by indicating that if he could not find in Lindahl's favor, an additional physical consultative examination would be ordered at the government's expense. In the alternative, Lindahl argues generally that the medical evidence of record "clearly justifies a finding that Mr. Lindahl is disabled." Pl.'s Mot. for Reversal.

1. Argument Concerning Testimony of Lindahl's Ex-Wife

Before discussing the merits of this argument, I note that Lindahl's entire argument consists of one sentence, cites no precedent, and does not identify what facts Lindahl's ex-wife would have testified to if given the opportunity. Lindahl does nothing more than assert that his ex-wife should have been permitted to testify to corroborate Lindahl's testimony. Although the ALJ did not hear testimony from Lindahl's ex-wife,

he agreed to stipulate that she would corroborate Lindahl's testimony. In addition, Lindahl did not challenge the ALJ's stipulation in any way. In fact, Lindahl agreed that his ex-wife would merely corroborate Lindahl's testimony and provide no new facts. Simply because the ALJ did not ultimately find Lindahl's testimony credible in light of physicians' opinions and his objective medical record, does not mean Lindahl was deprived a full opportunity to present his case. As such, I do not find Lindahl's first argument persuasive.

2. <u>Failure to Order a Consultative Examination</u>

As with Lindahl's first argument, his second argument is utterly skeletal. Again, it consists of one summary sentence without citing to the record or to precedent. Lindahl argues that the ALJ erred by failing to order a physical examination. I disagree. At the March 15, 2001 hearing, the ALJ clearly stated that he would only order a physical evaluation if he found it was necessary based on the medical evidence presented to him. Lindahl does not explain why such an examination would have provided different or additional information than that which was provided by the various physicians who treated Lindahl since 1995. As such, I reject Lindahl's second challenge to the

Commissioner's decision.

3.  Lindahl's "Not Supported by Substantial Evidence" Challenge

In the alternative, Lindahl argues that the medical record does not support a finding that Lindahl is not disabled.  The only evidence Lindahl uses to support this argument are block quotes taken out of context from physicians.  He does not make a specific challenge to the medical record nor does he challenge the state physicians' medical examinations.  Dr. Fairley, a state physician, found him in good physical condition and noted that he never met the diagnostic criteria for either  chronic fatigue or fibromyalgia.  He further indicated that Lindahl was capable of performing medium work.  Dr. Stenslie, a state psychologist, found that Lindahl's personality disorder did not impact his ability to perform work.

The record is replete with support for the ALJ's decision regarding Lindahl's physical symptoms.  For example, in a more recent visit to Dr. Binczewski, Lindahl himself stated that his physical pain was limited to "acute flares" and that he only needed medication once every one or two weeks.  (Tr. 299).  In a June 1999 visit to Dr. Caudill-Slosberg, Lindahl described how he rode his bicycle on a daily basis, was sleeping six to eight

hours a night, and was not having mood problems. Dr. Caudill-Slosberg noted that Lindahl did not have symptoms of fibromyaglia. In addition, the ALJ's findings regarding Lindahl's psychological state are supported by substantial evidence. Lindahl's 1996 neuropsychological evaluation showed no evidence of a learning disability and in a March 2000 psychological examination, Dr. Mullaly found that Lindahl had no signs of significant memory or concentration problems or any sign of attention deficient disorder.

The ALJ's decision that Lindahl is both physically and mentally capable of performing medium work is supported by substantial evidence in the record. As such, I deny Lindahl's motion to reverse the decision of the Commissioner.

## IV. CONCLUSION

For the forgoing reasons, Lindahl's motion to reverse the decision of the Commissioner is denied. (Doc. No. 6). The Commissioner's motion for order affirming is granted. (Doc. No. 11). The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.


_____
Paul Barbadoro
Chief Judge


August 21, 2003

cc:  David L. Broderick, Esq.
     Maureen Raiche Manning, Esq.